**Herbert MENZEL, and the Conjugal Partnership consisting of Herbert Menzel and Dorothy Menzel, Plaintiffs,**

v.

**WESTERN AUTO SUPPLY COMPANY, Defendant.**

**Civ. No. 86–0112(PG).**

United States District Court, D. Puerto Rico.

June 8, 1987.

Harvey B. Nachman, Santurce, P.R., for plaintiffs.

Jorge L. Capó Matos, Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

The matter is before this Court on defendant's, Western Auto Supply Company (hereinafter Western Auto), motion for

summary judgment requesting that plaintiffs', Herbert Menzel and the conjugal partnership consisting of Herbert Menzel and Dorothy Menzel (hereinafter plaintiffs), claims under the Age Discrimination in Employment Act (hereinafter ADEA), 29 U.S.C. § 621, et seq.; the Commonwealth of Puerto Rico Law No. 100 of June 30, 1959, 29 L.P.R.A. § 146 et seq.; and the Commonwealth Law No. 80 of May 30, 1976, 29 L.P.R.A. § 185a et seq., be dismissed.

Plaintiffs assert jurisdiction over the claims arising under the laws of the Commonwealth of Puerto Rico pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions in file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1982).

### Findings of Fact

After a thorough review of the entire record, including all the responsive pleadings, affidavits and documents filed this Court finds that there is no genuine issue as to the following material facts:

1. Defendant, Western Auto, is an employer as defined by ADEA and does business in this judicial district.

2. Plaintiff Herbert Menzel worked for Western Auto from approximately January 24, 1978, until August 26, 1985, when he was dismissed. Menzel was 49 years old when employed by Western Auto and 57 years old at the time of dismissal.

3. Throughout his employment, Menzel was evaluated by his immediate supervisors as an employee who placed more emphasis in volume production than in quality business. Based on volume production exclusively, Mr. Menzel earned prizes on several occasions. In the supervisors' opinion, Menzel demonstrated a neglect for details and accuracy, both in reporting functions and expenses and in the performance of his duties. On many occasions Menzel did not follow Company policies and procedures and did not follow up on assignments.[1] (A.H. Velghe's Sworn Statement, par. 5; T. Reese Stansel's Sworn Statement, pars. 3–5; Jeff L. Turner's Sworn Statement, pars. 3 and 5; Terry S. McCoy's Sworn Statement). The record is full of specific examples of Menzel's flawed performance, however, for brevity purposes, most, but not all of them, will be stated in this Opinion.

4. On or about October 19, 1979, Menzel faced a serious disciplinary action, during which his discharge was considered because of his lack of detail in his reporting of expenses and in the performance of his

---

1. Plaintiffs claim that Menzel was never evaluated as less than satisfactory; that the sworn statements of Messrs. Velghe, Stansel, Turner and McCoy have little value when they are not subject to cross-examination, and that Mr. McCoy's sworn statement is not in accord with all of his deposition testimony.

Although Mr. Menzel has never been evaluated as less than satisfactory in his "overall performance" evaluations, plaintiffs have not denied Menzel's failure to follow company policy and instructions regarding charge-offs. Furthermore, the fact that an employee could have been performing in a creditable manner does not rebut deficiencies leading up to termination. *See, Kittredge v. Parker Hannifin Corp.,* 597 F.Supp. 605, 610 (N.D.Mich.1984) (that employee generally received overall satisfactory rating on evaluation proceedings termination is not inconsistent with evidence of undesirable flaws in employee's performance.)

Second, plaintiffs cannot evade summary judgment by ignoring sworn statements. A party opposing a Rule 56 motion cannot rely on the hope that favorable evidence will somehow turn out during trial to defeat summary judgment. *Parker v. Federal National Mortgage Association,* 741 F.2d 975, 980 (7th Cir.1984). Plaintiffs must do more than expect to argue before a jury that a Rule 56 movant's evidence is not credible. Thus, unless adequately disputed under Fed.R. Civ.P. 56, affidavits could suffice to sustain summary judgment.

Third, to state that an affidavit is not in accord with all of the affiant's deposition testimony does not suffice to defeat summary judgment. Furthermore, we have found no contradiction to justify a trial on the merits.

duties. Menzel was subject to an internal audit at Western Auto concerning excessive mileage expense reimbursement requests, as well as excessive undocumented requests for reimbursements of telephone calls while on the field. His superiors, however, recommended that Menzel's employment not be terminated because of Menzel's past dedication to the Company and the fact that no dishonesty was involved. (A.H. Velghe's Sworn Statement, par. 6).[2]

5. Jeff L. Turner was Menzel's supervisor from December 1980 until June 1983. On April 28, 1981, and May 14, 1981, Turner admonished Menzel for several deficiencies in Menzel's work performance concerning credit collections or credit applications and the quality of the receivables Menzel was approving for conversion. (Jess L. Turner's Sworn Statement, par. 3(a) and (b) and Exhibits A and B thereto).

6. During the year 1981, Terry S. McCoy, as Assistant General Credit Manager for Western Auto, met with Menzel to instruct him about company procedures and the use of good judgment in approving conversions from installment accounts to the revolving account system. For some time Menzel was demonstrating poor judgment in the evaluation of the quality of the accounts versus more quantity. After the meeting, Terry S. McCoy submitted a report on Menzel's performance to his superior, A.H. Velghe. The report, dated July 8, 1981, and which was sent to Menzel's file, cited the following specific examples of incorrect credit judgment on Menzel's part:

1. Conversions received with application clearly noted that the account had been previously declined by Kansas City.

2. Approval of new account by telephone when we spend small fortune for Watts line and personnel to handle telephone approval via Kansas City.

3. Recent meeting included confirmation that FSs were to check Total Charge media during visits to insure daily mailing to Kansas City. Yet dealer in Clewiston, Florida which had a history of holding Total Charge payments and has had a number of visits for conversion purposes, recently submitted Total Charge payments that covered a period of two full calendar months. With the history of holding payments, what did Herb do in recent visits other than convert?

4. If I were to attempt to second guess Herb as to the reason for his approving conversions with poor stability, low income, no and/or weak credit, it would be his desire for sheer numbers and a very heavy dependence on the customer's past pay record or installment and the Dealer's personal opinion of the account.

5. While dating back to original conversion days, Bernard Johnson is an example of what can happen. The account was converted in January 1980 with an initial conversion balance in excess of $4,000. Customer's application and credit bureau report indicated an obvious overobligation. Herb thought very strongly that the decision should stand and said that he would collect it if it were delinquent. The account was in the Collection Department four months after being opened. It has not been current since the first billing. Present status is a balance of $4,551. The amount delinquent on the account is $1,713. The account will be a mandatory charge off this month. By July 1980 Herb was called upon to attempt collection on the account. Since July, Mr. Menzel with the assistance of a retail store manager and a dealer and through his own outside chase efforts, has collected two payments of $150 each. As stated, the first contact with Herb for collection assistance was July 1980, the last being April 28, 1981. During this period of time, there have been numerous requests for assistance, and I am sure numerous at-

---

**2.** In their opposition to defendant's motion for summary judgment, plaintiffs argue that an event that occurred six years prior to Menzel's dismissal has no materiality in terms of Menzel's evaluation and performance in 1985. Plaintiffs, however, fail to challenge the truthfulness of the statement. Further, when viewed in the context of the reasons for Menzel's dismissal, it is relevant in tracing a recurrent pattern of performance regarding administration, control, quality, follow-up and compliance with established procedure.

tempts at chasing this customer. However, as stated, we are in the process of charging off in excess of $4,000 of this account. I would think that the personal time spent by Herb in trying to collect this account would leave a lasting impression as to the need for quality in our receivables but it appears that the direction being taken is quantity, quantity, quantity.

I know Herb can. I honestly do not know why he is not.

(Terry S. McCoy Sworn Statement, par. 3 and Exhibit A attached thereto).

7. On November 4, 1981, Turner met with Menzel in Macon, Georgia, to terminate Menzel's employment. Turner's reasons for firing him were his poor judgment in the use of his time and travel expenses and other job performance deficiencies as perceived by Turner. At the personal request of A.H. Velghe, who intervened on Menzel's behalf when informed of his dismissal, Turner agreed to reinstate Menzel on the job. (Jeff L. Turner's Sworn Statement, par. 3(f); A.H. Velghe's Sworn Statement, par. 7; H. Menzel Deposition, August 18, 1986, p. 25).

8. On November 13, 1981, Turner sent a memorandum to Menzel in which he seriously questioned his judgment in dividing his time between the small tasks and the important tasks of his job. Menzel was told to spend more time in doing what he had to do, instead of unwarrantly criticizing or censuring other members of Western Auto.

9. On January 26, 1982, Turner prepared a Management Performance Appraisal on Menzel covering the period of January 1, 1981, to December 31, 1981. Turner's stated comments therein were that although Menzel had very good intentions, he was often overly sympathetic with dealers, had trouble recognizing good quality credit, kept very poor expense control and often talked when he should be listening. His overall performance evaluation was "satisfactory". Copy of the appraisal was received by Menzel. His specific performance review compared to established objectives consisted of ratings of good, excellent

and unsatisfactory. (Jeff L. Turner's Sworn Statement, par. 3(b); Exhibit C thereto; H. Menzel's Deposition, August 18, 1986, pp. 29 & 31).

10. On January 27, 1982, Turner sent a confidential memorandum to his superior, Mr. C.C. Vess. Therein, he recommended the lowest percentage pay increase for Menzel, compared to the other field supervisors under his supervision because in Turner's opinion, Menzel's performance did not justify more. (Jeff L. Turner's Sworn Statement, par. 3(i); Exhibit I thereto).

11. On March 12, 1982, Turner sent Menzel a memorandum reminding him of specific instructions with respect to collection proceedings which Menzel had not followed. Turner had instructed Menzel that if he could not collect the SIB, he was not to leave the store until he had called Turner on the phone. Menzel did not collect the SIB in a particular store on March 9, 1982, nor did he call Turner. Menzel did not respond to this memorandum. (Jeff L. Turner's Sworn Statement, pars. 3(j) and 4; Exhibit D. thereto; H. Menzel's Deposition, August 18, 1986, p. 31; H. Menzel's Deposition Exhibit VI).

12. On June 15, 1982, Jeff L. Turner sent a memorandum to Menzel admonishing him for his poor performance as Senior Field Supervisor-Credit while refreshing his recollection as to Company procedures in granting loans. In particular, Turner was very concerned with respect to a particular loan request for which Menzel had not used the correct approval criteria. Menzel received and did not respond to this memorandum. (Jeff L. Turner's Sworn Statement, par. 3(1) and (4); Exhibit L. thereto; H. Menzel's Deposition, August 18, 1986, pp. 33–35).

13. On December 2, 1982, Turner sent Menzel a memorandum with respect to dealer checks. Menzel received the memorandum and did not respond. In the memorandum Turner made the following observations:

In this morning's mail we received your report for your visit to Sebring, Fla. The report is dated November 24, 1982. It was mailed in a (sic) envelope post

marked November 30, 1982. There was a check attached to the report for $2,000.00. You indicated that the check was to be applied to the dealer's delinquency. It would appear that you held this dealer's check in your possession from November 24, to November 30, 1982. If this is the case in fact it is totally inexcusable. Monies received from a dealer are always and without fail to be mailed the day they are received. The store visit report should be written the day the store visit is made and should be mailed along with the check. However, if for some unknown reason you can't complete the report that day the check should still be mailed with a (sic) explanation that the store visit report is to follow.

(Jeff L. Turner's Sworn Statement, pars. 3(n) and 4; Exhibit N thereto; H. Menzel's Deposition, August 18, 1986, pp. 35 and 37; H. Menzel's Deposition Exhibit X.)

14. On December 7, 1982, and January 25, 1983, Turner sent Menzel two memorandums reprimanding him for incomplete store visit reports. Menzel did not respond. (Jeff L. Turner's Sworn Statement, pars. 3(o) and 4; Exhibits O and P thereto; H. Menzel's Deposition, August 18, 1986, p. 38; H. Menzel's Deposition Exhibit XI.)

15. On February 2, 1983, Turner prepared a Management Performance Appraisal on Menzel covering the period of January 1, 1982, to December 31, 1982. Turner's stated comments therein were that Menzel had been instrumental in improving Puerto Rico's operation because of Menzel's new ideas. Among Menzel's other strengths were his planning, his relation to his dealers and his control over the budget and his ability to adapt to a different environment. The overall performance evaluation was good. Mr. Turner points out, however, that Menzel needed to improve in his communication and job knowledge skills. He specifically points out Menzel's incomplete reports, misunderstanding of instructions and his weak knowledge of why,

where and how to make a dealer loan. (Exhibit I attached to Hoffman's Deposition).

16. Before Menzel was transferred to Puerto Rico in June 1983, he spent considerable time in Kansas City in the Credit Department. During the revolving credit installation and conversion period he had help from personnel in Kansas City (A.H. Velghe's Sworn Statement, pars. 3 and 9; H. Menzel's Deposition, August 18, 1986, p. 41, line 19).

17. In June 1983, Menzel was appointed Credit Division Manager in Puerto Rico. He was extensively instructed by Terry S. McCoy, his supervisor, concerning his new responsibilities. (Terry S. McCoy's Sworn Statement, par. 4; A.H. Velghe's Sworn Statement, par. 4; Menzel's Deposition, August 18, 1986, pp. 41–42).

18. On April 1984, Mr. Menzel received an award for an idea that he suggested prior to coming to Puerto Rico concerning the use of pre-approval solicitating mail in conjunction with the credit bureau in the States. (Hoffman's Deposition, p. 22; Exhibits 1 and 2 attached to McCoy's Deposition).

19. A.H. Velghe visited Puerto Rico in late October 1984. His visit resulted from conversations with Terry S. McCoy, who had aired his opinion about Menzel's unsatisfactory work performance for some time. Therefore, A.H. Velghe decided to observe Menzel's performance first hand. During the visit he discovered that the charge-off policy had not been followed. In consultation with Menzel and his assistant Estrada, A.H. Velghe concluded that the amount which should have been charged-off prior to that time was in excess of $400,000. In A.H. Velghe's opinion, this was a serious operational problem because it distorted the statistical performance of the Puerto Rico office. Velghe discussed this deficiency with McCoy. (A.H. Velghe's Sworn Statement, par. 10; Terry S. McCoy's Sworn Statement, par. 13).[3]

---

**3.** According to plaintiffs, this paragraph amounts to hearsay "not worthy of credence nor of comment." Yet, plaintiffs do not explain why the statement constitutes inadmissible hearsay not worthy of credence or comment.

20. On February 8, 1985, McCoy prepared a Management Performance Appraisal of Menzel that covered the period of 1/1/84 to 12/29/84. The overall evaluation categories were: unsatisfactory, meets standards, exceeds standards and excellent. Menzel was rated: "meets standards". His areas requiring improvement were mentioned in Section III of the Performance Appraisal; namely, having a hard time understanding and following instructions as well as in doing follow-up to specific assignments; also, overreaction to situations and not taking enough time to think things through. His major strengths were overall credit knowledge, experience, oral communicative skills and adaptability. He had an "excellent" rating in the productivity and payroll objectives but "unsatisfactory" in the "stay in the budget" objective. (Terry S. McCoy's Sworn Statement, par. 11 and Exhibit F thereto).

21. In March 1985, Menzel, as well as all other managers in Western Auto, received a salary increase. Menzel's increase was below the Company's average for similar position. (John H. Supplee's Sworn Statement, par. 4).

22. On March 15, 1985, McCoy sent Menzel a memorandum regarding McCoy's visit to Puerto Rico. Therein, McCoy pointed out that the communication problems continued in that specific instructions were not being followed. In his sworn statement, McCoy points out that there were indications that Menzel was not controlling the office operations, that he was unaware of what was going on, and that he was misinforming Western Auto's home office, either willingly or negligently, as to the results of operations. McCoy was concerned that Menzel was not fully understanding his instructions on how to manage his operations. Among the specific problematic areas addressed in the memoranda were: credit balances, charge-off procedures; collection reviews; repossessions; procedure to deal with returned checks; lowering of scheduled monthly payments on different accounts, credit bureau usage, etc. Menzel received this memorandum and did not object to it. (Terry S. McCoy's Sworn Statement, par. 12; H. Menzel's Deposition, August 18, 1986, pp. 50–51).

23. On March 1985 McCoy informed Vice President A.H. Velghe that during McCoy's visit to Puerto Rico, after reviewing the charge-off procedure, he discovered that more than $200,000 had not been charged-off in accordance with company policy (A.H. Velghe's Sworn Statement, par. 11) even though the charge-off policy had been explained to Menzel in numerous occasions. (McCoy's Deposition, p. 71).

24. On June 27, 1985, McCoy prepared a memorandum to the file reporting his visit to the Puerto Rico office from May 25 until June 1, 1985. This was done to back up and explain to A.H. Veghe the specific reasons for McCoy's recommendation that Menzel's employment be terminated. This memorandum was given to Velghe, as well as another one dated June 28, 1985, copy of which was also sent to H. Menzel. In the June 27, 1985, memorandum, McCoy stated that he found no improvement on the overall management of the office. In particular, he stated therein that there was a grand opening of Puerto Rico Flag Stores planned for May 27, 1985, for which many of the preparations had not been made by Menzel at the time of McCoy's arrival. McCoy had the impression that Menzel, either was not aware of the preparation requirements for the grand opening or had lied to him. McCoy was completely dissatisfied with Menzel's performance, in particular with insufficient staff to perform duties during the ceremonies. McCoy had to cover for these deficiencies, which included hiring additional temporary personnel. Although Menzel was previously advised of the procedures, he claimed to be surprised that he was required to make the arrangements. The following are a series of incidents or deficiencies related to the grand opening which were recorded in the June 27, 1985, memorandum:

a) Temporary personnel had not been hired and assigned to the top six stores as per the instructions Terry McCoy had given.

Plaintiffs' problem hinges on the groundlessness of their objections.

b) Although Menzel had confirmed to McCoy that no one would be off in the credit approval area on Thursday or Friday (May 30 and 31, 1985) due to the grand opening, McCoy later discovered that 25% of the qualified evaluator staff was scheduled to be off on Thursday, the first day of the grand opening.

c) On the first day of the grand opening 74% of the staff scheduled to work that day were at lunch at 12:28 p.m. even though Menzel had confirmed to McCoy that he had rearranged the lunch schedule so that at least 50% of the staff would be available.

d) On Friday, May 31, 1985, at 9:00 a.m., there was no one answering the phone at the credit office. This was the second day of the grand opening and the switchboard which receives all incoming calls from the stores was unmanned. When confronted with this Menzel had no response.

(Terry S. McCoy's Sworn Statement, par. 14; Exhibit H thereto; A.H. Velghe's Sworn Statement, par. 12; Exhibit B thereto).

25. In the memorandum of June 27, 1985, McCoy also stated that during his May 1985 visit to Puerto Rico he confronted Menzel on several irregularities with respect to uncollectable accounts. The memorandum contains an extensive list of specific deficiencies and irregularities with which McCoy confronted Menzel, these being basically:

a) Verbal and written policy and procedures concerning charge-offs were not being followed.

b) Team leaders, who were supposedly the best collectors, were performing more clerical functions that collection functions.

c) Duplicate accounts or credit balances of charge-offs (Company 301 accounts) were not being properly handled.

d) Contrary to the policy and procedures established, collection efforts were being made to collect charged off accounts instead of being placed with the collection agency.

e) Previous collection cards were not being researched and given to the collector.

f) Documentation and follow-up of perceived deficiencies in the assistant managers had not been completed satisfactorily.

(Terry S. McCoy's Sworn Statement, pars. 14, 15 and 16; Exhibit H thereto).

26. In June 1985, there was an $85,000 reporting error from Puerto Rico's credit office in a statement approved by Menzel. McCoy was informed of this error. (Terry S. McCoy's Sworn Statement, par. 9; Exhibit J. thereto; H. Menzel's Deposition, August 16, 1986, pp. 55–56).

27. During the months of February to June 1985, McCoy spoke with A.H. Velghe and Mr. J. Garraty, Senior Vice-President, Management Services, about Menzel's performance. In early June 1985 all three of them reviewed Menzel's past history with the company and the different occasions in which they had given him the opportunity to correct said deficiencies. Violations of the Company's "charge off" policy which had been discovered in October 1984 and March 1985 were discussed between them, together with Menzel's more recent deficiencies or poor work performance. In McCoy's opinion and that of the others, Menzel was simply not following the instructions and was not correcting his deficiencies. McCoy recommended, and was supported by both Velghe and Garraty, to discharge Menzel. (Terry S. McCoy's Sworn Statement, pars. 18 and 21; A.H. Velghe's Sworn Statement, pars. 13–17).

28. Menzel believes he was dismissed because of his age because in his opinion he was discharged without just cause; the person who replaced him is much younger; when replaced he had little more than a year to go to vest for his pension benefits; and his replacement had a lower salary and benefits. (H. Menzel's Deposition, August 18, 1986, pp. 68, 71).

*Conclusions of Law*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c); *Celotex Corp. v. Catrett, supra.* In determining whether summary judgment is appropriate the Court must look at the record and indulge all inferences in the light most favorable to the party opposing the motion. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Hahn v. Sargent,* 523 F.2d 461 (1st Cir. 1975). To be considered "genuine" a material issue must be established by sufficient evidence supporting the claimed factual dispute to require a trial on the merits. *Hahn v. Sargent,* 523 F.2d at 464. In other words, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non moving party." *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*ADEA Claim*

■ In an age discrimination suit the burden of establishing that the defendant discriminated against plaintiff remains with the plaintiff at all times. *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1011 (1st Cir. 1979). The plaintiff can carry this burden directly by presenting evidence that he was discharged because of his age, *see, Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981), or by using the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as adopted by *Loeb v. Textron, Inc., supra.*

■ Pursuant to *Loeb,* a plaintiff carries the initial burden of establishing a *prima facie* case of age discrimination. If a *prima facie* case has been established, the employer must articulate a legitimate, nondiscriminatory reason for the discharge. This is not a burden of persuasion but of production. If met, the employee must then prove by a preponderance of the evidence that the employer's explanation was a mere pretext for discrimination.

■ To create a *prima facie* case under ADEA, plaintiffs must show that 1) Menzel belonged to the protected class; 2) his job performance was sufficient to meet his employer's legitimate expectations; 3) he was discharged in spite of his performance; and 4) the employer sought a replacement for him. *Loeb,* 600 F.2d at 1014. The Court's task is to ascertain at each step of the test whether any issue of material fact emerges authentically and, if not, whether the case calls for judgment as a matter of law. *Smith v. Chamber of Commerce,* 645 F.Supp. 604, 606 (D.D.C.1986).

■ Defendant's position is that plaintiffs have failed to carry their burden with respect to step 2 of the *prima facie* case. Defendant, however, has preferred to assume for purposes of argument that plaintiffs have established a *prima facie* case and has moved to articulate, through the introduction of admissible evidence, the legitimate nondiscriminatory reasons for Menzel's dismissal. In support thereof, Western Auto has pointed to depositions, sworn statements and memoranda by personnel with direct supervisory responsibility over Menzel. A review of the entire record shows that Western Auto has met this burden.

On March 15, 1985, Terry McCoy, Menzel's supervisor, sent Menzel a memorandum regarding McCoy's observations of Menzel's performance during a recent visit to Puerto Rico. Therein, McCoy stated that Menzel was not fully understanding McCoy's instructions on how to manage Western Auto's credit operations in Puerto Rico. The specific problematic matters addressed in the memorandum included, among others: charge-off procedures, collection reviews, repossession and procedure to deal with returned checks. (Findings of Fact No. 22).

In Western Auto's parlance, a charge-off refers to the balance owed by a consumer that for whatever reason the consumer does not pay and, accordingly, is taken as a charge to the loss statement of the company for nonpayment. Not enforcing charge-offs reflects a profitability overstatement of operations. (Plaintiffs' Opposition Ex-

hibit No. V, p. 71). Western Auto's policy for charge-offs thus required that any consumer account not making a qualifying payment for six consecutive months be considered a mandatory charge-off and that, regardless of the reasons for nonpayment, the account be charged to the loss statement of the company. *Id.*, at p. 71.

The charge-off policy had been explained to Menzel on numerous occasions. (Findings of Fact 23). Yet, as noted in the March 1985 McCoy Memorandum, McCoy uncovered that the Puerto Rico division under Menzel reflected $200,000 which should have been charged to operational loss. The same problem, however, had already occurred in October 1984. At the time, it had been determined that Menzel's Puerto Rico office carried $400,000 which should have been reflected as loss. (Findings of Fact 19). Even Menzel admits having been aware of the problem involving the $400,000 and did not deny either having received the McCoy March 1985 Memorandum or having discussed the content thereof with McCoy nor the problem involving the $200,000 noted above. (Menzel's Deposition of August 18, 1986, pp. 46, 50).

This serious situation, however, went unabated as charge-off policy irregularities were again detected during McCoy's visit to Puerto Rico in May 1985. (Findings of Fact 25). The charge-off irregularities amount to both infringements of company policy and violations of instructions from his supervisor. *Id.* Further, they underscored Menzel's inability to overcome noted performance deficiencies, particularly in the area of not being able to understand and follow up instructions.

This problem was compounded by reporting errors from Menzel's Puerto Rico credit office. Thus, in June 1985 there was an $85,000 reporting error from the Puerto Rico office in a statement Menzel had approved. (Findings of Fact 26). Additional problems transpired, such as Menzel's flawed performance during a grand opening of Puerto Rico's Flag Stores in May 1985. (Findings of Fact 25).

The foregoing reflects a pattern of serious problems involving noncompliance with company policy and inability to follow up instructions on Menzel's part. Moreover, while Menzel had been informed of these deficiencies, he had not been able to correct them.

The foregoing also amounts to legitimate employer concerns justifying, if not properly rebutted, summary judgment dismissing the ADEA complaint. *Dea v. Look*, 810 F.2d 12 (1st Cir.1987); *Oglesby v. Coca-Cola Bottling Co.*, 620 F.Supp. 1336, 1347 (D.Ill.1985) (employee did not meet employer's legitimate expectations even though he could have been excelling in sales volume, yet was deficient in other job areas, such as monitoring of delinquent accounts and timely filing of written reports).

Thus, pursuant to *Loeb* and *Dea*, *supra*, the burden now shifts back to plaintiffs to prove that Western Auto's articulated reasons are but a pretext for discrimination. In determining whether this burden has been met, the question is not whether defendant's decision to fire Menzel reflected an objective fact finding judgment of plaintiff's abilities but whether it was unlawfully motivated. *Loeb v. Textron*, 600 F.2d at 1014. Thus, plaintiffs cannot avoid a motion for summary judgment merely by showing that the employer's decision was unwise or unfair. Plaintiffs must prove by a preponderance of the evidence that Menzel's age was the determining factor in his discharge in the sense that "but for his employer's motive to discriminate against him because of his age, he would not have been discharged." *Id.*, at 1019.

In order to defeat summary judgment plaintiffs must present evidence addressing or negating Western Auto's reasons to discharge Menzel. *See, Dea v. Look, supra.* This entails submitting evidence sufficient to prevail before a jury on such issues. *See, generally, Anderson v. Liberty Lobby, supra.* Plaintiffs have failed to meet this burden.

In this case, plaintiff's evidence had to at least respond to or address Western Auto's proof that Menzel 1) was infringing company policy concerning charge-offs; 2) was

not following instructions on company policy and administrative and control matters; 3) had authorized an inaccurate statement amounting to $85,000; and 4) had proved incapable of overcoming deficiencies of which he was aware.

In order to prove that Western Auto's articulated reasons are but a pretext for discrimination plaintiffs have offered Mr. Stanley Hoffman's [4] testimony to try to establish that: 1) from 1977 through 1983 Menzel's performance overall was very good and that in 1983 Menzel had been chosen to head defendant's credit office in Puerto Rico; 2) the overall rating given to Menzel in his 1982 evaluation should have been a high good or a very good overall rating; 3) Menzel received an award on August 21, 1985; and 4) Mr. McCoy did not complain to Menzel about a certain store not having credit applications or about other deficiencies.

Plaintiffs have also offered Mr. McCoy's testimony to try to establish that 1) Menzel got merit increases which were not automatic since same employees did not get merit increases every year; and 2) Menzel had been sent to Puerto Rico to perform a conversion process and said conversion was a success.[5]

█ This evidence, even if admissible, is insufficient to create a genuine issue of material fact and insufficient to prove that the employer's explanation was a mere pretext for discrimination.

**4.** Up to October 1984, Stanley Hoffman was corporate vice president of Western Auto in charge of overall administration of credit functions.

**5.** Plaintiffs have also alleged:
  In showing that a stated reason is pretextual, evidence that people who are older do not generally survive in management positions at Western Auto in Puerto Rico, is a factor that must be weighed by the fact-finder. Obviously, the defendant's successor plan to lower the age of lower echelon employees is relevant evidence as to the true motive of the defendant's action in removing the plaintiff without any just cause.
  (Opposition to defendant's motion for summary judgment, p. 15).
  Plaintiffs have two problems. First, the only evidence on record we found related to the first

### a. Hoffman's Testimony

Assuming the admissibility of Hoffman's opinion testimony that Menzel's performance from 1977 to 1983 was very good or that in 1982 Menzel's overall performance evaluation should have been very good or that in 1983 Menzel was chosen to head defendant's credit office in Puerto Rico, these do not create a genuine issue of material fact insofar as they do not negate flaws in Menzel's performance thereafter. An employee initially qualified for a job could have thereupon performed unsatisfactorily so that the employer could be justified in dismissing him from employment. *See, e.g., Sack v. Kimberly-Clark Corp.*, 33 F.E.P. Cases 624, 626 (E.D.Wis. 1983) (that an employee had been originally hired for the job from which he was subsequently discharged does not negate that he performed unsatisfactorily and not according to his employer's legitimate expectations). Consequently, even assuming, *arguendo*, that Menzel was (as Hoffman suggested) initially qualified when hired and that he might have performed well in the past, summary judgment still is mandated by Fed.R.Civ.P. 56, due to plaintiffs' failure to rebut Western Auto's evidence of serious flaws in Menzel's performance for the period preceding dismissal.

### b. Menzel's Award

█ Plaintiffs' counsel asserts Menzel received an award on August 21, 1985.

statement is that in his deposition Mr. McCoy agreed that among the exempt personnel Mr. Menzel was the oldest employee in the Credit Department in Puerto Rico and he knew of nobody older, even among the non-exempt personnel. This evidence, however, is clearly insufficient to show by preponderance of the evidence that Western Auto's reasons for Menzel's dismissal were just a pretext. It fails to explain how and why older employees do not generally survive in Western Auto. Many of these employees could have left Western Auto for any reason, including death, transfer, disability, voluntary termination or justified dismissal.

Second, there is no evidence on record to support plaintiffs' contention that the defendant's successor has a plan to lower the age of lower echelon employees.

(Opposition p. 12). However, the record shows that the award was given in April 1984 (Hoffman's Deposition, p. 22; Exhibits 1 and 2 attached to McCoy's Deposition) for an idea that Menzel suggested before coming to Puerto Rico concerning the use of pre-approved solicitation mail in conjunction with the credit herein in the states. Again, an employee generally could be performing satisfactorily in some areas of the job, yet be deficient in others. *See, e.g., Oglesby v. Coca Cola Bottling Co., supra,* (employee did not meet employer's legitimate expectations even though he could have been excelling in sales volume, yet was deficient in other job areas, such as monitoring of delinquent accounts and timely filing of written reports). Yet, that does not deprive the employer of the right or authority properly to terminate employees with performance deficiencies.

Consequently, Menzel's 1984 good idea award cannot obscure the fact that he was not performing as his employer legitimately expected at the time of termination.[6]

### c. *Menzel's Salary Increases and Evaluations*

Plaintiffs state that Mr. McCoy admitted that Menzel got increases every year and that these were not automatic because some people did not receive them. (Opposition, p. 14). However, Mr. McCoy did explain that "when someone reaches the maximum for their range they do not receive an increase." Furthermore, Mr. McCoy stated that Menzel's increases were below those of other people reporting directly to him. (McCoy's Deposition, p. 69). Moreover, an increase in salary is not inconsistent with employee deficiencies leading up to an employer's legitimate decision to dismiss him. *See, e.g., Grant v. Gannett Co., Inc.,* 538 F.Supp. 686, 692–693 (D.Del.1982) (age discrimination complaint dismissed because even though employee-plaintiff had received bonuses and salary increases, he had not rebutted employer's evidence that plaintiff had failed to over-

come deficiencies in important areas of management). Accordingly, the so-called merit increase does not negate Menzel's deficiencies as legitimate basis for his dismissal.

Nor is summary judgment prevented by evidence that Menzel's performance had been rated as satisfactory or better. *See, Kittredge v. Parker Hannifin Corp.,* 597 F.Supp. at 610 (that employee generally received overall satisfactory rating on an evaluation preceding termination is not inconsistent with evidence of undesirable flaws in employee's performance).

### d. *The Alleged Absence of Certain Complaints by McCoy*

Plaintiffs seek to create a factual issue by offering Menzel's deposition testimony as evidence that McCoy never complained to Menzel during McCoy's May 1985 visit to Puerto Rico. (Plaintiffs' Opposition, p. 13). The truth of the matter, however, is that plaintiffs *do not deny* that McCoy discussed with Menzel the points raised in the March 1985 Memorandum which followed McCoy's visit to Puerto Rico. Menzel admitted as much during his deposition. (Menzel's Deposition, August 18, 1986, pp. 64–67).

### e. *Profits in the Puerto Rico Operation*

Plaintiffs also seek to create an issue about profitability of Puerto Rico credit operations under Menzel. Although it has no bearing on the reasons advanced by defendant for Menzel's dismissal, plaintiffs insist that before Menzel came to Puerto Rico the office was losing money and that under Menzel such office was a success. Assuming this was true, just because the company was not losing money does not avoid entry of summary judgment. That fact does not address the issues herein nor the reasons for the dismissal. *See, Dale v. Chicago Tribune Co.,* 797 F.2d 458 (7th Cir.1986). Moreover, as explained in Plain-

---

**6.** Between 1977 and 1983 Menzel also received numerous awards based on volume production alone. (See, A.H. Velghe's Sworn Statement, par. 5). However, again, this cannot obscure the fact that he was not performing as his employer legitimately expected at the time of termination.

tiffs' Opposition Exhibit IV, pp. 69–70, credit profitability in Puerto Rico from 1983 on resulted from centralization and computerizing of operation.

The undisputed facts in this case show that Menzel was discharged for reasons unrelated to his age. Menzel's personnel record, which was prepared in the normal course of business, the sworn statements and depositions filed reveal that prior to coming to Puerto Rico Menzel had on numerous occasions been unable to follow instructions and Company policy concerning charge-offs. Menzel had been informed of these deficiencies but had not been able to correct them. In fact, six months prior to his discharge, Menzel again failed to follow instructions and company policy concerning charge-offs. Furthermore, he had authorized an inaccurate statement amounting to $85,000 and had numerous deficiencies in his handling of the grand opening of Puerto Rico Flag Stores in May 1985. We further note that when Menzel was hired in 1978 he was 49 years old and was already an older worker for purposes of ADEA.

*Plaintiffs' Law No. 100 and Law No. 80 claims*

Law No. 100 of June 30, 1959, as amended, 29 L.P.R.A. § 146 *et seq.*, prohibits, among other things, an employee's dismissal for the reason of age. Law No. 100 also provides for a rebuttable presumption of existence of discriminatory motive when the absence of just cause is demonstrated. This rebuttable presumption shifts the burden of proof to the employer, who must go forward with evidence that shows through preponderance of the evidence absence of discrimination in the employee's discharge. To activate the presumption plaintiff must prove that the discharge was performed without just cause. *Ibañez v. Molinos de Puerto Rico, Inc.,* 114 D.P.R. 42, 50–56 (1983). If plaintiffs cannot establish the bases to trigger the presumption, that is, absence of just cause in the discharge, then the Court should dismiss the claim.

The undisputed facts in this case show that Menzel was discharged for just cause and for reasons unrelated to his age.

As we have indicated, the record before us shows that prior to coming to Puerto Rico Menzel had on numerous occasions been unable to follow instructions and Company policy concerning charge-offs. Menzel had been informed of these deficiencies but had not been able to correct them. Six months prior to his discharge, Menzel failed to follow instructions and company policy concerning charge-offs. Furthermore, he had authorized an inaccurate statement amounting to $85,000 and had numerous deficiencies in his handling of the grand opening of Puerto Rico Flag Stores in May 1985.

Furthermore, assuming that there was absence of just cause for Menzel's discharge, defendant clearly established absence of discrimination in his discharge.

The foregoing discussion also suffices to dismiss plaintiff's discharge indemnity claim under Commonwealth Law No. 80.

Law No. 80 of May 30, 1976, 29 L.P.R.A. § 185a, *et seq.*, was enacted to protect employees from unjust dismissals by their employer. The purpose of the statute is to provide for limited protection (monetary indemnity) from arbitrary dismissals but without unreasonably limiting the employer's inherent freedom to choose and maintain only competent employees. Statement of Motive, Act May 30, 1976, No. 80 Laws of Puerto Rico 1976, p. 251. Just cause is that which has its origin in the proper and normal operation of the employer's establishment. 29 L.P.R.A. § 185(b). To assist in the comprehension of this cardinal principle, section 185b provides a listing of several specific reasons contemplated as "just cause." That section provides:

Good cause for the discharge of an employee of an establishment shall be understood to be:

a. That the worker indulges in a pattern of improper or disorderly conduct.

b. The attitude of the employee of not performing his work in an efficient manner or of doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment.

c. Repeated violations by the employee of the reasonable rules and regulations established for the operation of the establishment, provided a written copy thereof has been timely furnished to the employee.

d. Full, temporary or partial closing of the operations of the establishment.

e. Technological or reorganizaion changes as well as changes of style, design or nature of the product made or handled by the establishment and in the services rendered to the public.

f. Reductions in employment made necessary by a reduction in the volume of production, sales or profits, anticipated or prevalent at the time of the discharge.

In the present case, the record reveals just cause for Menzel's dismissal, *i.e.:* the repeated nature of Menzel's deficient performance, 29 L.P.R.A. § 185b(b), and repeated violations of the Company's policies, as well as Menzel's failure to follow his supervisor's instructions, § 185b(c).

WHEREFORE, in view of the above Western Auto's motion for summary judgment requesting the dismissal of plaintiffs' claims under ADEA and Commonwealth Laws 100 and 80 is hereby GRANTED.

IT IS SO ORDERED.