Eddie **DOMINGUEZ et al., Plaintiffs,**

v.

**ELI LILLY AND COMPANY
et al., Defendants.**

**Natividad Correa et al., Plaintiffs,**

v.

**Eli Lilly and Company et al., Defendants.**

**Nos. 95–1043 HL, 95–2073 HL.**

United States District Court,
D. Puerto Rico.

March 21, 1997.

---

45. Trial Exhibit # 19 at pp. 58–59.

46. Trial Exhibit # 19 at p. 52.

47. Exhibit E to # 14.

48. Exhibit C to # 14.

49. Exhibit D to # 14.

Rosa M. Nogueras, San Juan, PR, for Plaintiffs.

Carl E. Schuster, Schuster, Usera, Aguilo & Santiago, San Juan, PR, for Eli Lilly and Co., Inc. of Indianapolis, IN.

Mari C. Bosch–Alomar, McConnell Valdes, San Juan, PR, Carl E. Schuster, Maria L. Santiago–de–Vidal, Schuster, Usera, Aguilo & Santiago, San Juan, PR, for Eli Lilly Indus., Inc.

## OPINION AND ORDER

LAFFITTE, District Judge.

Before the Court is Defendants' motion for summary judgment and Plaintiffs' opposition thereto. For the reasons adumbrated below, the Court **grants** Defendants' motion for summary judgment on Plaintiffs' ADEA, Law 100, and Article 1802 claims, dismisses Plaintiffs' claims with prejudice, and enters judgment accordingly.

### STANDARD OF REVIEW

The summary judgment tool filters out cases in which plaintiffs rely entirely upon conclusory assertions and speculative allegations to state a claim for relief. After a respectable period of time for discovery through interrogatories, requests for admissions, requests for the production of documents, and depositions, reliance upon pure speculation is unacceptable. Plaintiffs are required to garner either direct or circumstantial evidence to back upon their legal

claims. Throughout the discovery process, the plaintiffs should constantly be focused on gathering relevant evidence that, at the very least, creates a genuine issue of material fact in dispute.[1] Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

All too frequently, litigants before the District Court of Puerto Rico overlook the importance of the anti-ferret rule in the summary judgment stage: Local Rule 311.12. Without such a rule, the Court would have to search through the record, with or without the assistance of counsel, for lurking evidence of a genuine issue of material fact. *Stepanischen v. Merchants Despatch Transport. Corp.*, 722 F.2d 922, 920–31 (1st Cir. 1983). Local Rule 311.12 prevents "the recurrent problem of 'ferreting through the record'" and "the specter of district judges being unfairly sandbagged by unadvertised factual issues." *Id.* at 931. It requires the party moving for summary judgment to file a separate, short, and concise statement of material facts that supports its claim that there is no genuine issue of material fact in dispute. These facts are deemed admitted unless the non-moving party files a similarly separate, short, and concise statement of material facts demonstrating that there is a genuine issue in dispute.

The anti-ferret rule serves one crucial purpose. It lays out the material facts in dispute clearly for a district court that is swamped with an overwhelming number of civil and criminal dispositive motions. It requires both the moving party and the non-moving party to properly support their respective lists of material facts with specific references to the Record. Without specific references to the Record, the list of uncontested and contested facts does not serve its

purpose. The Court would have to continue to ferret through the Record, read all the answers to the interrogatories, study all the attached documents, and carefully scrutinize all the depositions for lurking genuine issues of material facts. *Stepanischen* warns parties, however, that the failure to make specific references to the Record "would, where appropriate, be grounds for judgment against the party." *Id.*

The anti-ferret rule does not change the shifting burdens of the parties. The moving party, along with its statement of uncontested facts, has the initial burden of pointing out the absence of evidence and the non-moving party, along with its statement of contested facts, has the ultimate burden of setting forth the specific facts that create a genuine issue for trial. The rule also does not change the non-moving party's burden of coming forward with more than a trivial, "scintilla of evidence" or creating more than a "metaphysical doubt as to the material facts." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Once the non-movant comes forward with more than a scintilla of evidence, the Court construes the material facts and reasonable inferences drawn therefrom in favor of the non-moving party.

## PLAINTIFFS' VIOLATION OF THE ANTI–FERRET RULE

At issue in this case is Defendants' Early Retirement Plan ("ERP"). Plaintiffs and Defendants have diametrically opposed interpretations of why Defendants introduced the ERP. On the one hand, Plaintiffs allege that they agreed to retire under the plan because Defendants presented them with a take-it-or-leave-it demand. *See* Pls.'

---

1. For example, in an age discrimination case such as the one before the Court today, the plaintiffs should obviously disregard the defendants' policies on racial relations or the number of women who work for the defendants' company. Such information is not relevant to the legal question of age discrimination. It wastes the time of the plaintiffs, the plaintiffs' counsel, the defendants, the deponents, and the defendants' counsel. One would think that this would be an

obvious procedural and substantive point. However, buried deep in the record are numerous examples of Plaintiffs asking deponents irrelevant questions and searching for information that does not help resolve any genuine issue in an age discrimination case. *See, e.g.,* Pls.' Opp'n Mot., Dkt. No. 115, Ex. 1 at 115—135 (Plaintiffs' counsel asking a management level employee of Eli Lilly Industries about the racial and gender make-up of the work force).

Am. Compls., Dkt. Nos. 9 & 30. According to Plaintiffs, Defendants forced them to accept early retirement because of their age by: (a) making working conditions entirely unappealable and unreasonable before they offered the ERP, *see* Pl.'s Am. Compl., Dkt. No. 9 at ¶'s 23—30 & 40; Pls.' Am. Compl., Dkt. No. 30 at ¶17; (b) harassing older employees before they offered the ERP, *see* Pl.'s Am. Compl., Dkt. No. 9 at ¶'s 35; Pls.' Am. Compl., Dkt. No. 30 at ¶21; and (c) offering them a voluntary retirement plan full of incentives under the threat that if they rejected the plan they could be demoted or discharged, *see* Pl.'s Am. Compl., Dkt. No. 9 at ¶'s 37—39 & 41—43; Pls.' Am. Compl., Dkt. No. 30 at ¶22—23, 25—27. In essence, Plaintiffs allege that Defendants' actions forced them to retire early because of their age and, therefore, constitutes a constructive discharge in violation of the Age Discrimination in Employment Act and Puerto Rico's Law 100.

On the other hand, Defendants argue that Plaintiffs' acceptance of the ERP was voluntary, free from coercion and undue pressure, and selected by Plaintiffs because of the beneficial incentives in the plan. Defendants assert that it was part of a world-wide reorganization of the company which had absolutely nothing to do with age discrimination. Defendants maintain that many employees who rejected the plan continue to work for the company today.

If there was evidentiary support for both Plaintiffs and Defendants' respective positions, undoubtedly there would be several genuine issues of material facts in dispute precluding the entry of a judgment as a matter of law. However, Plaintiffs have (1) failed to comply with the anti-ferret rule and (2) failed to produce probative evidence of age discrimination.

Attached to Plaintiffs' motion opposing summary judgment is a twenty-five page list of contested facts filled with speculation, generalities, conclusory assertions, improbable inferences, and, for lack of a better phrase, a lot of "hot air." Pls.' Opp'n Mot., Dkt. No. 115 at 4—30.[2] Plaintiffs' quotation from the anti-ferret rule leaves out the most important part:. "The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried, *properly supported by specific reference to the record.*" Local Rule 311.12 (emphasis added); Pls.' Opp'n Mot., Dkt. No. 115 at 4. Plaintiffs fail in every sense of the word to substantiate their contested facts with proper and specific references to the Record.

There are contested facts which do not refer to any exhibit at all: #'s 2, 4, 6, 7, 10, 11, 13, 14, 15, 16, 17, 19, 20, & 21.[3] There are contested facts which refer to exhibits but leave out the specific location of the evidentiary support within the exhibit: #'s 1, 3, 12, & 18. There are contested facts which refer to exhibits that do not support the alleged contentions: #'s 1, 3, & 12. Furthermore, there are contested facts which speculate as to Defendants' intentions and actions without any evidentiary support whatsoever: #'s 1, 2, 3, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, & 20. Finally, there are contested facts that discuss issues that are entirely irrelevant to the question of whether

2. Plaintiffs' Exhibit 5 is also labeled as a list of "Contested Issue of Facts." None of these alleged facts are supported by specific reference to the Record.

3. Plaintiffs sometimes refer to pages of deposition testimony which are not a part of the Record. *See, e.g.,* Pls.' Opp'n Mot., Dkt. No. 115 at 17 (citing deposition testimony of Eddie Dominguez which is not part of the Record). Plaintiffs accuse Defendants of leaving pertinent information out of the Record by not filing the entire deposition testimony of each Plaintiff. *See id.* at 23 & 27 ("Defendant should be asked by this Honorable Court to present the whole deposition as an Exhibit of their motion as to assure this

Honorable Court that they are not quoting Plaintiffs out of context.") Plaintiffs misunderstand, however, that Defendants are not responsible for filing the complete deposition of every deponent. Plaintiffs, who have access to all the depositions, must file the portions of the depositions that they deem to be relevant. In the adversarial process, Defendants are not obligated to assist Plaintiffs and present the evidence which supports Plaintiffs' position. Plaintiffs' bizarre reference to the "best evidence rule" makes no sense whatsoever in the context of a Rule 56 motion. *See id.* at 27 ("Pursuant to the best evidence rule the whole document should be produced as evidence of their true testimony.").

there was age discrimination: #'s 2 (whether the ERP compensated Plaintiffs for all their years of service and whether it was an attractive plan); 10 (whether Defendants breached the terms of the ERP); 12 (while the ERP pamphlet and discussions were in Spanish, the one-page acceptance form was in English); 16, 17, 18, & 19 (whether Plaintiffs accepted a good retirement deal); and 20 (the other individuals who accepted the ERP have not sued because they either do not want to have anything to do with Defendants anymore or lack the appropriate legal advice).

As a result of Plaintiffs' violation of the anti-ferret rule, Plaintiffs have deemed admitted the following uncontested facts: #'s 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, B.1—B.13, C.1—C.11, D.1—D.3, E.1—E.12, F.1—F.4, G.1—G.9, H.1—H.8, & I.1—I.12. As explained in the discussion section below, these admissions alone require the Court to grant Defendants' motion for summary judgment and enter judgment as a matter of law in favor of Defendants.

There may be a very good reason why Plaintiffs overlooked the anti-ferret rule. An independent and thorough examination of the Record reveals that there is no evidentiary support for Plaintiffs' speculative accusations.[4] Some of the most glaring examples of conclusory assertions without any proof are: (1) Younger individuals with less experience replaced Plaintiffs initially as temporary employees and later as permanent employees, *see* Pls.' Opp'n Mot., Dkt. No. 115 at 6—7; (2) Defendants introduced the ERP as a subterfuge to discharge and discriminate against older employees, *see id.* at 8; (3) Defendants pressured Plaintiffs to make the ERP decision, urged them to accept the ERP in order to give new opportunities to younger people, and misrepresented the benefits of the ERP, *see id.* at 8—9; (4) Plaintiffs never consulted an attorney as advised by Defendants because they were under

stress and did not want to spend the additional money for an attorney, *see id.* at 12—13; (5) Between six months and two years before Defendants offered the ERP, Defendants persecuted Plaintiffs, altered their evaluations, required them to do excessive work, and denied them promotions and raises, *see id.* at 13; (6) Defendants did not want Plaintiffs consulting management officials in the company in order to increase Plaintiffs' stress, violate their "constitutional liberty of speech and association," and force them into early retirement, *see id.* at 13—14; (7) Co-Plaintiff Eddie Dominguez' acceptance of the plan one day before the deadline demonstrates that he had no plans to retire but exercised this option because he felt discriminated against because of his age, *see id.* at 17; (8) Plaintiffs agreed to retire early out of fear that the working conditions would become intolerable, *see id.* at 22; and (9) The employees that rejected the ERP and continue to work for Defendants have either been demoted, denied raises, or forced to alter their positions with the company, *see id.* at 26.

In light of Plaintiffs' failure to comply with the anti-ferret rule, the Court hereby **grants** Defendants' motion for summary judgment. Plaintiffs have not specifically referred to any evidence in the Record indicating that Defendants presented them with a take-it-or-leave-it option. They have not referred the Court to any evidence that the alternative to the ERP was so unappealing or arduous that any reasonable individual would have no choice but to accept early retirement. The Court need not proceed any further. However, in the alternative, even assuming that Plaintiffs did not violate the anti-ferret rule and specifically referred to all the evidence that is lurking in the Record, the Court would reach the same result. What follows is an analysis of Plaintiffs' claims as if they produced a proper motion for summary judgment including a list of contested material

---

**4.** Throughout Plaintiffs' list of contested facts, Plaintiffs admitted frequently that they did not have the necessary evidence to support their claims. For example, Plaintiffs stated: "We have no evidence as to the real amount of people to whom the Plan was truly, offered, how many accepted, and whether the conditions under which the Plan was offer[red] and the benefits received by them were the same or similar to that of Plaintiffs." *See* Pls.' Opp'n Mot., Dkt. No. 115 at 5.

facts with specific reference to the evidence in the Record.

## FACTS

In October 1993, Eli Lilly & Co., Inc. (hereinafter "Defendants" or "Eli Lilly") offered its employees an Early Retirement Plan. It was part of an effort to reorganize the company's operations, reduce costs, and increase profitability.[5] Eli Lilly wanted to eliminate 4,000 jobs world-wide for financial reasons.[6] Naturally, the ERP contained several attractive features to entice some of the two thousand and five-hundred employees who qualified for the ERP to accept the offer. Plaintiffs, (1) Francisco Berríos Rosa ("Berríos"), (2) Olga Esther Santana Castro de Romero ("Santana"), (3) Julio Cabán Sánchez ("Cabán"), (4) Carmen Haydee Diaz de Hiraldo ("Hiraldo"), (5) Natividad Correa García ("Correa"), (6) Emma J. Quiñones ("Quiñones"), (7) Hernan Febres Romero ("Febres"), and (8) Eddie Dominguez ("Dominguez"), accepted the offer and officially retired on December 31, 1993.

Normally, Eli Lilly employees must have a combined total of 80 points in order to qualify for retirement. The 80 points are based upon a combination of the employee's age and the employee's years of service with the company. For example, an individual who is fifty-seven years old and has been working for the company for twenty-five years has a combined total of eighty-two points and, therefore, may exercise the option to retire.

However, because this individual is relatively young, the company reduces the employee's retirement benefits by three percent for every year that she or he is under the age of sixty-two. This is considered a penalty for retiring at an early age.[7]

The ERP offered better terms. First, it reduced the number of points that an employee needed to retire by four for a total of 76 points. Second, it eliminated the penalty for employees who were under the age of sixty-two at the time of retirement. An individual who was fifty years old with twenty-six years of experience, therefore, had the option of retiring four years earlier without a penalty for being under sixty-two years old.[8] Third, the employee would receive a lump sum payment on December 31, 1993 which was based on the numbers of years of service to the company. The maximum amount that the employee could receive was the annual salary of the employee.[9] Fourth, the employees who accepted the ERP would receive the company's medical and dental plan free of charge for them, their spouses, and their children. Fifth, they would receive a five-percent Christmas bonus in December 1993 and a corporate bonus in February 1994. Sixth, the employee would be paid for their accrued vacation time. Seventh, the employee had the option of continuing to participate in the Credit Union, receive all medicines produced by the company free of charge, and

**5.** Borgos Aff., Defs.' Mot., Dkt. No. 109 at Ex. A (Ricardo Flores Borgos is the Director of Human Resources at Eli Lilly Industries, Inc. and an Eli Lilly employee since 1969); Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 80–81 (Raquel M. Llivina is currently the Human Resources Leader for the Central Area of Eli Lilly in Puerto Rico and was the Supervisor of Operations in charge of all the benefit plans in December 1993).

**6.** Berríos Depo. Part II, Defs.' Mot., Dkt. No. 109 at 11; Santana Depo., Defs.' Mot., Dkt. No. 109 at 45.

**7.** *Id.;* Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 18–19.

**8.** *Id.*

**9.** Defs.' Mot., Dkt. No. 109 at Ex. D; Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 38. Plaintiffs spend a great deal of their time arguing that Defendants promised them that the lump sum payment would not be subject to Puerto Rico taxes. Not only is this an irrelevant allegation under ADEA and Puerto Rico's Law 100, there is no evidentiary support for this proposition. On the contrary, there is overwhelming evidence that Eli Lilly told the employees that it would petition on their behalf for a tax exemption. Eli Lilly complied with its promise, petitioned for an exemption, and informed the employees promptly thereafter that the Puerto Rico Government rejected the suggestion. Berríos Depo., Defs.' Mot., Dkt. No. 109 at 39; Quiñones Depo., Defs.' Mot., Dkt. No. 109 at 32; Amparo Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 3 at 51; Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 109, Ex. 10 at 64–65.

eat in the company's cafeteria any time free of charge.[10]

Plaintiffs joined one-hundred and fifty-eight other individuals out of a possible total of one-hundred and eighty-five eligible Eli Lilly employees in Puerto Rico and accepted the early retirement package. Many employees who were older than Plaintiffs but did not have the equivalent number of years of service could not exercise the option to retire early.[11] The following chart summarizes each Plaintiff's (1) age at the time of retirement, (2) years of service with the company ("years"), (3) total number of points ("points"), (4) lump sum payment received ("cash"), and (5) date of acceptance of the ERP ("date"):[12]

| NAME | AGE | YEARS | POINTS | CASH ($) | DATE |
| --- | --- | --- | --- | --- | --- |
| BERRIOS | 55 | 28 | 83 | 32,449.20 | 11/3/93 |
| SANTANA | 52 | 26 | 78 | 27,298.47 | 11/11/93 |
| CABAN | 58 | 23 | 81 | 42,511.50 | 11/5/93 |
| HIRALDO | 51 | 27 | 78 | 28,861.20 | |
| CORREA | 55 | 24 | 79 | 25,793.04 | 11/4/93 |
| QUINONES | 56 | 27 | 83 | 31,176.24 | 11/23/93 |
| FEBRES | 57 | 27 | 84 | 29,145.56 | 12/9/93 |
| DOMINGUEZ | 57 | 28 | 85 | 36,396.00 | 11/8/93 |

From the chart it is quite apparent that, with the exception of Santana, Hiraldo, and Correa, many of the Plaintiffs could not take advantage of the four free points given to those employees who were short of 80 points. However, all of the Plaintiffs clearly received a large lump sum cash payment in exchange for accepting the ERP and all Plaintiffs benefited because the ERP did not penalize them for being under sixty-two years old. Although most, if not all, of the Plaintiffs agreed to retire early in November 1993, Plaintiffs were given until six o'clock in the evening on December 9, 1993 to accept the package. Until December 9, 1993, Plaintiffs had the right to revoke their prior acceptance.[13]

Since early October 1993 when the company announced the ERP, the company provided Plaintiffs with as much information and advice as they needed.[14] Many of the eligible employees took advantage of the Human Resources' staff which was available to answer questions from eight o'clock in the morning until six o'clock in the evening.[15] In several meetings, they informed all the eligible employees, including Plaintiffs, that the plan was voluntary.[16] All the informational

**10.** Borgos Aff., Defs.' Mot., Dkt. No. 109 at Ex. A; Amparo Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 3 at 18 (Carmen Amparo Caceres de Rivera was an Assistant Personnel Representative who participated in distributing information about the ERP).

**11.** Febres' Depo., Pls.' Opp'n Mot., Dkt. No. 109, Ex. 8 at 14.

**12.** The information has been gathered from Plaintiffs' amended complaints, the affidavit submitted by Ricardo Flores Borgos, and the forms on which Plaintiffs accepted the ERP. See Pls.' Am. Compls., Dkt. Nos. 9 & 30; Defs.' Mot., Dkt. No. 109 at Exs. A, H, I, L, J, K, L, & M; see also Febres' Depo., Defs.' Mot., Dkt. No. 109 at 43. The age and the number of years that each Plaintiff worked for the company until retirement have been taken from Plaintiffs' amended complaints unless the Plaintiff's deposition contradicted that information. For example, although Plaintiffs' amended complaint indicated that Hiraldo was 52 years old with 28 years of experience when she retired, her deposition indicates

otherwise. Compare Pls.' Am. Compl., Dkt. No. 30 at ¶'s 15 & 16 with Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 44; see also Quiñones' Depo., Defs.' Mot., Dkt. No. 109 at 6.

**13.** Defs.' Mot., Dkt. No. 109 at Ex. D.

**14.** Berrios Depo., Defs.' Mot., Dkt. No. 109 at 11, 24, & 39; Santana Depo., Defs.' Mot., Dkt. No. 109 at 32, 44, 53, & 54; Dominguez Depo., Defs.' Mot., Dkt. No. 109 at 25; Quiñones Depo., Defs.' Mot., Dkt. No. 109 at 32; Febres Depo., Defs.' Mot., Dkt. No. 109 at 23, 24, & 28; Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 29, 31, 32, 46, 47, & 49; Amparo Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 3 at 27–29 & 36.

**15.** Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 69–72

**16.** Berrios Depo., Defs.' Mot., Dkt. No. 109 at 25, 40, & 41; Febres Depo., Defs.' Mot., Dkt. No. 109 at 31; Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 26 & 68.

pamphlets were in Spanish while the final form to accept the ERP was in English.[17] If they disliked the plan and they did not want to participate, they could stay with the company.

However, the management officials of the company forewarned them that there would be changes in the way that the company was run.[18] The positions of the employees would change and they would have to work in shifts; something that many of the employees strongly disliked. The company officials called this change "redeployment."[19] If the employees refused to accept the reorganization, the company would discharge them.[20]

There is a dispute over whether the company officials indicated that there would be lay-offs if the eligible employees did not accept the early retirement offer. Eli Lilly acknowledges that it wanted to eliminate 4,000 positions. However, its officials maintain that the employees were never told that there would be lay-offs. Co–Plaintiff Dominguez' deposition testimony backs this claim up. Dominguez testified that a management official denied that there would be lay-offs and urged him to report the employee that indicated otherwise.[21] In addition, the deposition testimony of Santana and Quiñones supports the company's position.[22] There is,

however, evidence substantiating the contrary proposition. Co–Plaintiff Berrios testified that Felipe Belgodere, the company's plant manager, told them that there could be lay-offs in the future.[23]

Regardless of whether there was a threat that employees would be terminated in the future, the company officials encouraged the eligible employees to think carefully about retirement. A staff of individuals was available during the week to answer any of the employees' questions. They urged them to consult a financial and/or a legal adviser to analyze their particular situation and consider all their options.[24] They provided a step by step explanation of the benefits of the plan while encouraging the employees to consider early retirement. Some of the documents that the employees received contained an itemized list of common expenses and a method to determine if the retirement package would cover their current and future expenses.

In spite of this assistance, the officials prohibited the company's management level employees from providing any advice on whether the eligible employees should accept or reject the plan. They told all the employees repeatedly that the employees should not consult with the company officials.[25] Any

---

17. Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 33.

18. Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 30. Eli Lilly in Puerto Rico began to hold meetings before October 1993 to discuss the intended reorganization. According to Vilma Fernández, Plaintiffs' co-employee who is not a party to this case, the managers informed the employees that the "group leader" and "supervisor" positions would be eliminated and replaced by a new position called "PTL." Fernández Depo., Defs.' Mot., Dkt. No. 109 at 14–15. Fernández' testimony substantiates Eli Lilly's claim that the ERP was part of the company's effort to reorganize.

19. Dominguez Depo., Defs.' Mot., Dkt. No. 109 at 32. There is a contradiction in the Record regarding whether the employees were told that their salaries would decrease as a result of the redeployment. According to Berrios and Cabán, Felipe Belgodere told the employees that the salary reduction would be commensurate with their new positions. Berrios Depo., Defs.' Mot., Dkt. No. 109 at 26; Cabán Depo., Pls.' Opp'n Mot., Dkt. No. 115 at 15. In contrast, according to Santana, the changes were called redeploy-

ment because the company would protect the current salaries of the employees. Santana Depo., Defs.' Mot., Dkt. No. 109 at 34.

20. Santana Depo., Defs.' Mot., Dkt. No. 109 at 45; Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 35 & 37.

21. Dominguez Depo., Defs.' Mot., Dkt. No. 109 at 33 & 44.

22. Santana Depo., Defs.' Mot., Dkt. No. 109 at 45; Santana Depo. Part II, Defs.' Mot., Dkt. No. 109 at 34; Quiñones Depo., Defs.' Mot., Dkt. No. 109 at 33.

23. Berrios Depo., Defs.' Mot., Dkt. No. 109 at 26.

24. Berrios Depo., Defs.' Mot., Dkt. No. 109 at 19 & 41; Cabán Depo., Defs.' Mot., Dkt. No. 109 at 16; Dominguez Depo., Defs.' Mot., Dkt. No. 109 at 25; Quiñones Depo., Defs.' Mot., Dkt. No. 109 at 32.

25. Berrios Depo., Defs.' Mot., Dkt. No. 109 at 41–42; Santana Depo., Defs.' Mot., Dkt. No. 109

officials which tried to persuade the employees to accept the offer would be subject to disciplinary action.[26] When a management level official learned that an employee told co-Plaintiff Dominguez that there would be lay-offs if they did not accept the ERP, the official told Dominguez that the employee was "absolutely wrong" and that he should report the attempt to pressure him right away.[27] The managers of the company were specifically told not to impose any undue pressure upon the eligible employees, not talk about their views of the plan, and not to link performance, age, or position to the retirement package.[28]

All of the Plaintiffs had, at the very least, six weeks to decide whether to accept the ERP. From a meeting held in the middle of October until December 9, 1993, all of the Plaintiffs except Correa heard the details of the ERP and had the opportunity to carefully consider the option.[29] Several of the employees who did not accept early retirement by December 9, 1993 continue to work for Eli Lilly in Puerto Rico today.[30] None of the Plaintiffs revoked their option to retire by December 9, 1993 and, therefore, their decision became irrevocable.[31]

The testimony of four Plaintiffs, Cabán, Berrios, Febres, and Correa, add a few wrinkles to this neat, picturesque portrayal of the Eli Lilly Early Retirement Plan. According to Cabán and Berrios, Felipe Belgodere announced in an October meeting that the eligible candidates for early retirement were specifically targeted because they were "very old and sick."[32] Belgodere added that the older workers should consider early retirement because they could not compete with the younger individuals who obtained university degrees and had knowledge of computers.[33] At that time, Felipe Belgodere was the plant manager of the Puerto Rico Eli Lilly company and one of the management level officials who was implementing the ERP.

Cabán and Febres also link the ERP with the increased pressure they both faced on the job in the early 1990's, at least one year before the company announced the ERP. Cabán cites four incidents where the company began to exert this "type of pressure on my person."[34] First, his supervisor required him to sign a memorandum stating that he must comply with the standard operating procedures for managing the company's equipment. Cabán believed that this duty was not required of anyone else and he was being singled out. Although Cabán refused to sign, he was not disciplined.[35] Second, on January 26, 1993, Cabán hurt his waist and the company doctor instructed him not to lift more than thirty pounds. Although Cabán wanted to work, his supervisor did not let him and refused to transfer him to the quali-

at 57; Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 40; Quiñones Depo., Defs.' Mot., Dkt. No. 109 at 32.

**26.** Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 40.

**27.** Dominguez Depo., Defs.' Mot., Dkt. No. 109 at 32, 33, 43, & 44.

**28.** Borgos Aff., Defs.' Mot., Dkt. No. 109 at Ex. A; Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 83.

**29.** Berrios Depo., Defs.' Mot., Dkt. No. 109 at 29; Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 27.

**30.** Berrios Depo., Defs.' Mot., Dkt. No. 109 at 9; Santana Depo. Part II, Defs.' Mot., Dkt. No. 109 at 19.

**31.** Berrios Depo., Defs.' Mot., Dkt. No. 109 at 20; Cabán Depo., Defs.' Mot., Dkt. No. 109 at 29; Correa Depo., Defs.' Mot., Dkt. No. 109 at 18;

Llivina Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 10 at 51.

**32.** Cabán Depo., Pls.' Opp'n Mot., Dkt. No. 115 at 14; Berrios Depo., Defs.' Mot., Dkt. No. 109 at 26.

**33.** *Id.* Berrios testified that Cabán, Quiñones, Febres, Hiraldo, Correa, and Dominguez were also present at the meeting. Berrios Depo., Defs.' Mot., Dkt. No. 109 at 29. Yet, Cabán is the only other Plaintiff to mention Belgodere's age-based remarks. Under the Rule 56 standard, the Court may not resolve this contradiction. The credibility of the Plaintiffs' respective testimonies may only be judged by a jury. Indeed, for the purpose of Defendants' motion, the Court assumes the truth of Cabán and Berrios' testimonies and indulges all inferences in their favor.

**34.** Cabán Depo., Defs.' Mot., Dkt. No. 109 at 18.

**35.** *Id.* at 18–20; Cabán Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 7 at 22–23.

ty control department. Later, on February 10, 1993, Cabán spoke with the company doctor, who spoke with the supervisor, and he was allowed to work despite the injury to his waist.[36] Third, on February 18, 1993, Cabán's supervisor did not allow him to go to a State Insurance Fund appointment. When Cabán went anyway, his supervisor criticized him in an evaluation for not being up-to-date with the company's procedures.[37] Finally, Cabán complains that his supervisors only gave him "above normal" evaluations in 1991 and 1992 for work that he considered to be of the highest caliber in the category of "excellent." [38] For Cabán, these four incidents created an arduous and unappealing work environment which contributed to his decision to accept early retirement.

Febres makes a similar allegation. He testified that by the time that the company offered the early retirement plan in 1993 he had felt an increased amount of stress on the job.[39] In the early 1990's, Febres received below normal evaluations for an electrician and was given less "higher priority" jobs than in the past.[40] Despite the fact that his evaluations eventually improved in 1992 to "above normal," Febres feels that he was under increasing stress because he was taken off the jobs related to wiring and the computers of the company and transferred to "lower priority" jobs such as checking the external lights.[41] For Febres, these changes amounted to a loss of respect and status in the company and contributed to his decision to retire early.

Cabán and Febres' co-Plaintiff Correa has a different story. She neither links the ERP with an age-based animus nor suggests that the company began to put pressure on her to make the job unappealing. Instead, she suggests that she was not medically competent to accept the early retirement offer.[42] When the company held its first meeting in late October for the eligible candidates for early retirement, Correa was home recovering from depression. Eli Lilly officials called her at home and told her to attend the meeting. At the meeting, the management level supervisors discussed the benefits of the ERP, explained its purpose, and informed the employees that they had until December 9, 1993 to make a decision. Correa states:

> Well, I was at that time with a depression and I could not understand everything that everyone said exactly because I was under medication and the company knew that I was taking some medication prescribed by the doctor.[43]

Because of Correa's depression, she told the manager at the meeting that she could not assimilate all of the information and asked if the company could send her additional information through the mail.[44] On November 4, 1993, Correa signed the ERP form and never looked back. On December 9, 1993, her decision became irrevocable.

Like Cabán and Berrios, most of the Plaintiffs agreed to retire early because they were afraid of the company's reorganization and the uncertainty of the future.[45] Most of the Plaintiffs did not want to work in shifts with other workers because this was considered a difficult, labor-intensive task. Hiraldo, for example, explained that she signed the ERP form because:

> People were worried because all of the people who attended was because we qualified for the retirement. We all had over

---

36. Cabán Depo, Defs.' Mot., Dkt. No. 109 at 21; Cabán Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 7 at 22.

37. Cabán Depo., Defs.' Mot., Dkt. No. 109 at 47–48.

38. *Id.* at 46–49.

39. Febres Depo., Defs.' Mot., Dkt. No. 109 at 33.

40. *Id.* at 44.

41. *Id.* at 55.

42. Correa Depo., Defs.' Mot., Dkt. No. 109 at 10–14.

43. *Id.* at 13–14.

44. *Id.* at 14.

45. Berrios Depo., Defs.' Mot., Dkt. No. 109 at 26–28; Cabán Depo., Pls.' Opp'n Mot., Dkt. No. 115, Ex. 7 at 14, 15, & 23; Santana Depo., Defs.' Mot., Dkt. No. 109 at 33–34; Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 36–37; Quiñones Depo., Defs.' Mot., Dkt. No. 109 at 33; Dominguez Depo., Defs.' Mot., Dkt. No. 109 at 32.

25 years in the company in general. Generally, all of us had at one time or another worked shift work. The majority of us had to be placed in jobs where we didn't have to do shift work anymore on the basis of our experience. And all of a sudden they tell you that if they need you and you're the chosen one, then you have to move and if you don't move you're out on the street.... I got scared. And I said, 'Well, what's going to become of me with my arm condition? I either leave and secure a pension and a health plan or I stay and expose myself to whatever comes.'[46]

According to Dominguez, the redeployment "would not assure the benefits" because "the company can move you around, and put you in any position where they felt they could."[47] Some of the Plaintiffs like Quiñones had been working years to get a promotion but were now told that they could be transferred to a different work station in the future despite the number of years that they labored in a specific area. When Quiñones heard about the ERP, she thought:

I didn't have plans to retire. But with what Mr. Belgodere told us, twenty-seven years with the company, I wanted them to give me another promotion. They gave me an excuse. And then with what he told us, I was afraid that they might transfer me in the future, after I struggled so much in my career.[48]

Plaintiffs felt that they had toiled for years working their way up the ladder of the Eli Lilly company in Puerto Rico. They were not going to throw caution to the wind and take their chances on a company that was preparing itself for a major reorganization. Their fear of the unknown and an insecure future cajoled them into retiring before they were ready. Certainly, without the ERP, most if not all of the Plaintiffs would not have retired on December 31, 1993.

**46.** Hiraldo Depo., Defs.' Mot., Dkt. No. 109 at 37 & 40.

**47.** Dominguez Depo., Defs.' Mot., Dkt. No. 109 at 32.

## DISCUSSION

### A. The Early Retirement Plan Under ADEA:

Under the Age Discrimination in Employment Act, 29 U.S.C.A. § 623 (1985), it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." All eight Plaintiffs allege that but for Defendants' desire to discriminate against them because of their age they would not have been forced to accept the Early Retirement Plan. As opposed to proving that Defendants employed a policy having a disparate impact on older individuals, Plaintiffs are attempting to prove disparate treatment or intentional discrimination. *Holt v. Gamewell Corp.*, 797 F.2d 36, 37 (1st Cir.1986).

Because Plaintiffs rely solely upon indirect evidence, the well-known burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973) serves as the prism through which the Court analyzes Plaintiffs' allegations of age discrimination. Plaintiffs have the initial burden of establishing a *prima facie* case of age discrimination and, thereby, creating the rebuttable presumption that they were given a Hobson's choice of accepting the ERP or termination.

■ There are four elements in the *prima facie* case of age discrimination: (1) Plaintiffs are at least 40 years of age, *see* 29 U.S.C.A. § 631(a) (Supp.1995); (2) Plaintiffs were either actually or constructively discharged. The First Circuit in *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986) explained that a constructive discharge occurs when the employee opts to leave the company rather than work under conditions " 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign;' " *see also Serrano–Cruz v. DFI Puerto Rico*, 109 F.3d 23, 25–27 (1st Cir.1997) (summarizing factors in con-

**48.** Quiñones' Depo., Defs.' Mot., Dkt. No. 109 at 33.

structive discharge case); (3) Plaintiffs were qualified for their respective positions and performing within the employer's legitimate expectations; and (4) The employer has sought a replacement or actually replaced the employee, demonstrating a continued need for someone to perform similar work after the employee left.[49] *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir. 1993); *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110–11 (1st Cir.1989).

■ Where a company intentionally reduces its work force, the fourth element has a different twist: (4) The employer did not treat age neutrally in shrinking its work force. "This lack of neutrality may be manifested either by a facially discriminatory policy or by a policy which, though age-neutral on its face, has the effect of discriminating against older persons, say, by leading inexorably to the retention of younger employees while similarly situated older employees are given their walking papers." *Vega*, 3 F.3d at 479.

■ The mere offer of an incentive-laden early retirement plan is not sufficient to demonstrate a constructive discharge. By its very nature, an early retirement plan is designed to attract the employee's attention and persuade the employee to retire early for his or her own benefit and for the benefit of the company. *Vega*, 3 F.3d at 480; *Hebert*, 872 F.2d at 1111; *Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986). "To transform an offer of early retirement into a constructive discharge, a plaintiff must show that the offer was nothing more than a charade, that is, a subterfuge disguising the employer's desire to purge plaintiff from the ranks because of his age." *Vega*, 3 F.3d at 480. The employee must be presented "with a 'choice' between the Scylla of forced retirement or the

Charybdis of discharge." *Hebert*, 872 F.2d at 1112. The employer either explicitly or through indirect means sends the employee a message: (a) take the benevolent early retirement package, or (b) you will (i) be fired, or (ii) face working conditions so arduous and unappealing that any reasonable person will feel compelled to resign. The crucial question in any age discrimination lawsuit over the acceptance of an early retirement plan is "whether the existing conditions (ignoring the offer of early retirement) violate the ADEA. If they do, then the employee may recover for that violation whether or not he took the package of benefits (though the value of the package would be taken into account in computing damages)." *Henn*, 819 F.2d at 829.

■ Although the ERP in and of itself may be more attractive to older workers and actually intend to entice older workers in the company to retire, the ERP is not a presumptively discriminatory plan. In fact, it is properly considered to be a "boon" and an enormous benefit to the employees which can take advantage of the offer. *Henn v. National Geographic Society*, 819 F.2d 824, 828 (7th Cir.1987). "And although the record may well support an inference that the [company] wanted to reduce the average age of its ... staff, this does not show that it used illegal means. Any early retirement program reduces the average age, because only older employees are eligible to retire." *Id.* at 830.

■ There are several factors that courts analyze to determine whether the early retirement package was a take-it-or-leave-it threat to the employee: (1) whether the company informed the employees that the package was voluntary, *Vega*, 3 F.3d at 480; (2) whether the employees were told of the

---

49. There are recent First Circuit cases that require the plaintiff to show that he or she was "replaced by another individual of similar skills and qualifications, thereby confirming the employer's continued need for equivalent services." *Vega*, 3 F.3d at 479; *Pages–Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 536 (1st Cir. 1996). However, the First Circuit has clarified that the plaintiff need only show that the employer has sought a replacement with similar qualifications and, thereby, revealed a continued need

for the equivalent services and skills. *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 154 (1st Cir.1990); *Mesnick v. General Electric Co.*, 950 F.2d 816, 823 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110 n. 10 (1st Cir.1989); *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1335 (1st Cir.1988); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012–13 (1st Cir.1979).

consequences of accepting and rejecting the package, *see Vega,* 3 F.3d at 480; *Henn,* 819 F.2d at 828; (3) whether the choice was free of fraud and undue influence, *see Vega,* 3 F.3d at 480; *Henn,* 819 F.2d at 828; (4) whether the employees had an opportunity to reject the package or revoke the package after they accepted, *see Vega,* 3 F.3d at 480; *Henn,* 819 F.2d at 828; (5) whether the employee had a reasonable amount of time to consult his or her family, a financial advisor, and/or an attorney, *see Henn,* 819 F.2d at 829; (6) whether the alternative to early retirement was a discharge because of the employee's age or the imposition of such arduous working conditions that a reasonable employee would feel compelled to leave, *see Henn,* 819 F.2d at 829; and (7) whether the company forewarned particular employees that they would be laid off if they did not accept the plan or told the employees that there could be some lay-offs or shifting of positions within the company if a certain number of individuals do not retire, *see Vega,* 3 F.3d at 480–81 ("broad-based subjugation to the risk of future termination is common fare in a depressed economic climate."). Merely encouraging the employees to accept the retirement option is not sufficient to create a genuine issue of a constructive discharge. *Compare Vega,* 3 F.3d 476, 478 (despite the fact that "Kodak encouraged workers to participate" in the retirement plan, there was no violation of ADEA) *and Schuler v. Polaroid Corp.,* 848 F.2d 276, 278 (1st Cir.1988) (despite the repeated urging of employee's boss to accept the plan, there was no violation of ADEA) *with Hebert,* 872 F.2d at 1112 (company's actions to specifically target plaintiff for retirement created a genuine issue of material fact on whether there was an ADEA violation).

■ Equally important are the factors which are not relevant to the inquiry. These include: (1) the employee's unreasonable, subjective perceptions of pressure and coercion, *see Vega,* 3 F.3d at 481; *Henn,* 819 F.2d at 829; (2) the "silent treatment" of the company whereby the management level employees of the company refuse to discuss their opinions of the plan, *see Henn,* 819 F.2d at 829; (3) the normal, everyday criticism of the employees before the offer and during the employee's consideration of the offer, *see Henn,* 819 F.2d at 830; and (4) an isolated, stray remark that older employees should accept retirement and welcome younger individuals to take their places, *see Henn,* 819 F.2d at 830; *Gray,* 792 F.2d at 254–55; *see also Vazquez Gonzalez v. K–Mart Corp.,* 940 F.Supp. 429, 436 (D.P.R.1996) ("[a]s a matter of law, one isolated, ambiguous remark by itself is insufficient to support a claim of discrimination under Title VII."); *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 96 (1st Cir.1996) (direct evidence of discrimination does not include stray remarks by non-decisionmakers or decisionmakers unrelated to the decisional process itself).

■ After an analysis of the relevant factors, if the Court determines that there is a genuine issue as to whether the retirement plan was a take-it-or-leave-it threat, the company has the burden of stating a nondiscriminatory rationale for offering the retirement plan. *Vega,* 3 F.3d at 479. Should the company produce an explanation for the plan, the burden would shift back to the employee for the final time. The employee would have to present probative, non-conclusory evidence that the employer's justification for the plan is a mere pretext that masks discrimination on the basis of age. *Id.* at 479; *see also Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) ("a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."). It is not enough for the employee to merely create a doubt as to whether the employer's business justification was wise or necessary at the time that it was made. "Nor is it enough to show that the employer acted arbitrarily or with ill will." *Gray,* 792 F.2d at 255. Twenty-twenty hindsight and Monday morning quarterbacking will not do the trick. The employee must produce evidence that demonstrates that the employer's discriminatory, age-based animus motivated the employer's decision to offer the retirement package. *Vega,* 3 F.3d at 479.

■ Leaving the ultimate burden upon the employee and requiring the employee to

produce probative, non-speculative evidence of discrimination may appear to some to stack the legal deck against the employee. Discrimination, should it occur, is often hidden behind business and legal justifications. "And how much more vexing are the problems of proof in a case such as this one, where a reduction in force has been undertaken for a legitimate business purpose and efforts to root out ... [an employee] run the risk of coincidentally resulting in the dismissal of a disproportionate number of older employees." *Hebert*, 872 F.2d at 1116. The burden-shifting framework, however, does not require the employees to produce smoking gun evidence of discrimination. It only requires probative, circumstantial evidence that an age-based animus was a motivating factor in implementing a take-it-or-leave-it retirement plan.

■■■ In a close case, determining whether the plaintiff has produced sufficient, probative circumstantial evidence of an age-based animus may be difficult. This, however, is not a close case. Plaintiffs have failed to make out an ADEA claim under both of the phases for which they carry the burden in the *McDonnell Douglas* framework.

Although Plaintiffs have established that they are older than 40 years old and that they were performing their jobs within Eli Lilly's legitimate expectations, they have not demonstrated that the ERP was a take-it-or-leave-it constructive discharge. If anything, the management officials of the company did exactly what the law requires of them. They obviously studied the requirements for offering an early retirement package, consulted their attorneys, and spent a considerable amount of time and effort to comply with the law.

Eli Lilly's managers instructed all of the eligible employees, including Plaintiffs, that the early retirement package was a voluntary option that they could exercise for their own benefit. They were informed that the company was undergoing a major, world-wide restructuring which required the elimination of approximately 4,000 jobs. Beginning in 1994, the employees could no longer expect to work under the same conditions and in their prior positions. Management officials

intended to return the employees to a "shift system" that had been implemented in the past. Under this system, employees would work in shifts depending upon the needs of the company. If necessary, the company might have to reduce some of the employees' salaries, demote some of the employees to less prestigious positions, and even layoff workers.

Plaintiffs rest their argument that the ERP was a take-it-or-leave-it charade principally on the threat of possible layoffs and demotions should the eligible employees reject the package. Eli Lilly officials, however, were simply being straightforward and sincere with the employees. Had they hidden this information from the employees, Eli Lilly would be vulnerable to accusations that it failed to provide all the pertinent information to the employees in order to permit them to make an informed decision. Moreover, as the First Circuit pointed out in *Vega*, Eli Lilly officials did not "directly or indirectly indicate which particular individuals would be tapped should layoffs prove to be necessary" and "it never threatened that persons ultimately selected for involuntary separation would be treated harshly." 3 F.3d at 481. If the Court found otherwise, any employee that was given an informed choice between an early retirement package and continued employment with the risk of future layoffs would state a claim for constructive discharge. Such a result would be incongruent with the realities of how the marketplace functions in the late twentieth century.

Management level officials at Eli Lilly did everything they could to ensure that the employees did not feel undue pressure to accept the ERP. The officials were subject to discipline if they attempted to influence the decision of the eligible employees. In fact, they were told specifically not to volunteer their opinions or answer any questions about their feelings of the value of the ERP. Plaintiffs themselves were told that they should not ask management officials whether they should accept the ERP. Although Plaintiffs seem to feel that this created an aura of secrecy surrounding the retirement package and left them in the dark about the company's intentions, as Judge Easterbrook found

in *Henn*, this "silent treatment" was probably done as a protective measure against lawsuits alleging that the company pressured the employees to take the early retirement package. 819 F.2d at 829.

Plaintiffs had a reasonable and sufficient amount of time to consider the package and reject the offer after accepting. They learned about the plan in an early October company announcement. By late October, all the Plaintiffs with the possible exception of Correa had intimate knowledge of the plan. At the very least, they had five weeks to mull the offer over with their family, financial advisor, and/or attorney. Eli Lilly officials even recommended that Plaintiffs consult their financial and legal advisors before making any final decision. Berrios, Santana, Caban, Correa, and Dominguez signed on the bottom line in favor of retirement in early November. Yet, they still had the right to revoke their prior decision by December 9, 1993.

■ There is no probative, non-speculative evidence that Eli Lilly imposed arduous or unappealing working conditions upon Plaintiffs before the announcement of the ERP and during the implementation of the ERP in such a manner that would compel a reasonable worker to accept the retirement plan. Berrios, Santana, Hiraldo, Quiñones, and Dominguez did not present any evidence whatsoever to substantiate such a claim. During their depositions, they did not make any allusions to the fact that they were subjected to unusually difficult working conditions near or around the time that the company offered the ERP. On the contrary, their testimony reveals that they were fearful of where they fit into the company's reorganized structure. Having been through the work shifts in the past as they worked their way up the company's hierarchy, they did not want to return to this labor-intensive system. They did not want to lose their status in the company with the possibility that they could be demoted, transferred, or laid-off. Their entire future depended on the ups and downs of the uncertain marketplace. So, they chose to take the benefits and run rather than risk their years of service for the unknown future. In some cases, undoubtedly, this was a wise decision. In others, it was regrettable. Either way, it was a decision that can *not* form the basis of an ADEA cause of action.

■ Caban and Febres were the only employees who testified about the increasing pressures on the job before the company announced the early retirement program. Their claims, however, do not add up to the creation of an arduous and unappealing work atmosphere. If anything, their testimony demonstrated that Eli Lilly treated its employees with fairness and concern. Caban's biggest complaint is that his supervisor treated him differently from other employees by making him sign a statement that he would not violate the company's standard operating procedures, telling Caban that he could not work after he injured his waist, criticizing Caban for not following normal procedures, and giving him lower than "excellent" evaluations. Febres, on the other hand, complains that he was taken off "higher priority" jobs as the years went on. Quite obviously, Caban and Febres' claims are nothing out of the ordinary. Criticism and change comes with the territory in the rough and tumble world of the workplace. When evaluated separately and together, Eli Lilly's decisions with respect to Caban and Febres were entirely reasonable and justifiable.

■ When it comes right down to it, all of the Plaintiffs with the exception of Correa, are relying upon the age-based biased remarks of Felipe Belgodere in order to make their case of a constructive discharge. As the Court has already pointed out, however, this is not enough to establish a legitimate claim that the ERP was a sham as opposed to a rationale choice between two reasonable options. Felipe Belgodere's comment that the eligible employees should consider early retirement seriously because they were "very old and sick" and could no longer compete with the more educated, youthful employee was a stray, isolated remark at one meeting on the ERP. In the context of the company's efforts to convey that the plan was optional, voluntary, and to be made without being influenced by the opinions of management level employees, it would be unreasonable to find that it alone created a genuine issue of material fact.

■ This finding, therefore, leaves Correa as the only Plaintiff who can legitimately claim that she was given a take-it-or-leave-it Hobson's choice. In her state of depression, which the company officials acknowledged, she argues that she could not understand the terms and conditions of the offer and, therefore, she was under duress when she made the decision to retire early. If she was in a severe state of depression and the company officials understood her medical condition, it is entirely possible that Correa did not understand that the offer was voluntary, that there were repercussions to accepting the offer without a revocation before December 9, 1993, and that she should carefully talk over the option with her family, friends, and advisers. Consequently, Correa is the only Plaintiff who has created a genuine issue of material fact as to whether she was given a take-it-or-leave-it early retirement offer.

■ However Correa, like all the Plaintiffs in this case, has not presented any evidence to establish the fourth prong of the prima facie case or link the early retirement package in any way, shape, or form to an age-based discriminatory animus. All the Plaintiffs rely on speculation and conclusory allegations to establish that Eli Lilly has sought a replacement for Plaintiffs or actually replaced Plaintiffs indicating a need for people to perform similar skills and services after they left. There is not even a scintilla of evidence in the Record discussing this point. In addition, Plaintiffs did not present any evidence that the ERP had the effect of discriminating against older individuals.[50] In fact, the evidence in the Record supported the opposite conclusion. Older workers with less years of service in the company were not permitted to retire early. They had no choice but to accept the changes in the company's structure after December 31, 1993. If the Court found that this ERP was either facially discriminatory or had a discriminatory impact, the fourth element of the prima facie case in early retirement cases would become superfluous.

■ Furthermore, even assuming hypothetically that Correa and the other seven Plaintiffs established a prima facie case, Plaintiffs have not demonstrated that Eli Lilly's non-discriminatory rationale for the ERP was a pretext to mask an intent to discriminate against Plaintiffs because of their age. Eli Lilly's non-discriminatory explanation is that the company was undergoing a worldwide restructuring in order to reduce costs and increase profitability. The ERP was the company's method of reducing the employee ranks by 4,000 people without laying anyone off. It provided the employees, who had been loyal to the company for years, with an option of retiring before the major overhaul.

■ In a conclusory fashion, Plaintiffs attack the business justification of Eli Lilly. They accuse the company of using the ERP as a means to discharge older workers and hire new, temporary employees who are younger and cost the company less money. There is no evidence, however, to back up their suppositions. Whether the reorganization was a wise business decision or even necessary for the company to earn more profits is not relevant. *See Allen v. Diebold, Inc.*, 33 F.3d 674, 677 (6th Cir.1994) (holding that ADEA does not shield the worker from the hardships and economic realities of the business world). Whether the attempted reorganization actually worked out or the company eventually returned to its previous work system is also not relevant. The key

---

**50.** Notably, Plaintiffs have not presented any statistical evidence on the number of eligible candidates over 40, the number of ineligible candidates over 40, the number of employees over 40 who accepted early retirement, and the number of employees over 40 who rejected early retirement. These statistics may have helped to determine whether the ERP had a discriminatory impact on workers in the protected class. *See Hebert*, 872 F.2d at 1114–15 ("Although admittedly weak, at least in raw form at the summary judgment stage of this ADEA action, such statistical evidence is admissible on the issue of pretext in a discrimination case to show a general pattern of discrimination."); *Schuler*, 848 F.2d at 279 (at prima facie stage employee failed to discuss "the size of the pool of potentially affected employees, the age or kind of employee likely in the pool, the nature of the work force at Polaroid or in the Polarizer Division, or the way in which these employees were treated that would permit a fact finder to find actionable age discrimination."); *Holt*, 797 F.2d at 38 (statistical evidence helpful to demonstrate a prima facie case of discriminatory impact).

question is what motivated the decision to implement the ERP and was that motivation due to an age-based discriminatory animus. No where in the Record, with the exception of the isolated, stray remarks of Felipe Belgodere, is there any linkage between the ERP and an age-based animus. As the Court discussed earlier, however, these remarks alone are not sufficient to create a genuine issue on Eli Lilly's age-based discriminatory animus.

Accordingly, the Court finds that none of the Plaintiffs have established either a prima facie case of age discrimination or evidence that Eli Lilly's non-discriminatory rationale was a pretext to mask an age-based discriminatory animus. The decision to accept early retirement was a voluntary, informed, choice free of fraud and undue influence. Berrios, Santana, Hiraldo, Quinones, and Dominguez did not even attempt to present evidence that Eli Lilly imposed arduous and unappealing working conditions before the implementation of the ERP. Caban and Febres' attempt failed miserably as they complained about treatment and incidents which are very common in the workplace. Correa was the only Plaintiff who raised a genuine question as to whether she was unduly pressured into retiring early but, like all the Plaintiffs, she also failed to establish the fourth prong of the prima facie case. Even when the Court assumed that the Plaintiffs presented probative evidence of a prima facie case, however, the Plaintiffs' case failed because there was no evidence that Eli Lilly's retirement package was motivated by discriminatory animus other than the isolated remark of Felipe Belgodere. Therefore, the Court hereby grants Defendants' motion for summary judgment on the Plaintiffs' respective ADEA claims.

B. *The Early Retirement Plan Under Puerto Rico's Law 100:*

 ˙Plaintiffs also allege that Eli Lilly violated Puerto Rico's Law 100 because it constructively discharged them due to their age. *See* Law 100 of June 30, 1959, as amended, P.R. Laws Ann. tit. 29, § 146 *et. seq.* (1985). Like ADEA, Law 100 prohibits the employer from either discharging, laying off, or discriminating against an employee regarding her or his salary, wages, working conditions, status, or work privileges on the basis of the employee's age. Even though the Court has already found that Plaintiffs have not garnered sufficient evidence to prove a violation of the ADEA, the burden of proof under Law 100 requires the Court to entertain Plaintiffs' claim in a separate analysis.

 Unlike ADEA, the burden of proof under Law 100 rests ultimately upon the employer. The employee carries the initial burden of presenting sufficient, probative evidence that she or he was discharged without "just cause." P.R. Laws Ann. tit. 29, § 148 (1985); *Ibañez Benitez v. Molinos de Puerto Rico,* 114 D.P.R. 42, 14 Official English Translations 58, 72 (1983); *see also De Arteaga v. Pall Ultrafine Filtration Corp.,* 862 F.2d 940, 943 (1st Cir.1988) (discussing burden shifting standard under Law 100 in the context of an age discrimination case); *Menzel v. Western Auto Supply Co.,* 848 F.2d 327, 330–31 (1st Cir.1988) (same). This burden encompasses two requirements. The employee must show that: (1) he or she was actually or constructively discharged; and (2) the discharge was without "just cause." *See, e.g., Arthur Young & Company v. Virgilio Vega III,* 94 J.T.S. 75 at 11962, 11972 (1994) (explaining the meaning of the constructive discharge element in the context of a "just cause" dismissal under Law 80).

 Courts typically skip over the first requirement because the employee is almost always suing the employer for firing him or her. This case, however, requires the Court to flesh out the situation whereby the employee leaves his or her place of employment on the alleged grounds that the working conditions became so unappealable and difficult that she or he felt compelled to leave. Like the federal counterpart, "constructive discharge" under Puerto Rico law requires the employee to show that the employer's actions compelled him or her to resign by "imposing or trying to impose on him more onerous working conditions, reducing his salary, lowering his category or submitting him to derogatory criticisms or humiliations by deed or word." P.R. Laws Ann. tit. 29, § 185e (1985). Puerto Rico courts, there-

fore, analyze the same factors as the First Circuit to determine if a reasonable employee would feel compelled to leave: (1) changes in salary; (2) new working conditions; (3) extreme demotions even at the same salary level; (4) loss of prestige; (5) animosity based on protected categories such as age, race, or sex; and (6) whether there was a targeted early retirement offer or simply a reorganization of the company. *Compare Velez Reilova v. Ramirez Palmer Bros., Inc.,* 94 P.R.R. 166, 169 (1967) *and Arthur Young & Company,* 94 J.T.S. at 11972 *with Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 25–27 (1st Cir.1997). Plaintiffs attempting to establish a constructive discharge claim must rely on more than mere speculation and conclusory assertions. *Arthur Young & Company,* 94 J.T.S. at 11972–73.

The Supreme Court in *Velez* summarized the test for "constructive discharge" as follows: "The voluntary and arbitrary actions of an employer tending to compel an employee to abandon his position, constitute a discharge where the only reasonable alternative left to the employee is the abandonment of the position." 94 P.R.R. at 169. Under this test, for example, a company which reorganizes its business and transfers the employee from her position as a "beauty-culture instructor" to a new position as a "cosmetic saleswoman" does not leave the employee with no other reasonable choice but to resign. This is especially true in light of the fact that the employee was going to receive the same salary and hold a more convenient position. *Id.* at 170.

Once the employee successfully passes the *Velez* test, he or she must still carry the initial burden of establishing that the discharge was *not* for "just cause." Because Law 100 does not provide a definition of "just cause," Puerto Rico courts adopt the guideline for justifiable dismissals from Puerto Rico's Law 80, P.R. Laws Ann. tit. 29, § 185b (Supp.1991), which also prohibits the discharge of the employee without "just cause."

*Baez Garcia v. Cooper Labs, Inc.,* 120 D.P.R. 145, 155 (1987); *Ibanez Benitez,* 114 D.P.R. at 50–51 n. 2, 14 Official English Translations at 69.

Pursuant to Law 80, there are six listed grounds upon which the employer may dismiss the employee for "just cause." The employee, therefore, must demonstrate that she or he was not dismissed for any one of the following reasons: (1) engaging in a pattern of improper or disorderly conduct; (2) performing her or his work either (a) inefficiently, (b) belatedly and negligently, or (c) contrary to the standard quality of the business' work product; (3) after being furnished a copy of the business' reasonable rules and regulations, the employee violated the rules repeatedly;[51] (4) there was a full, temporary, or partial closing of the business; (5) there were technological or reorganizational changes as well as changes in the business product or services; and (6) there were reductions in employment due to an anticipated lower volume of production, sales, or profits at the time of the employee's discharge. P.R. Laws Ann. tit. 29, § 185b (Supp.1991). This is not meant to be an exhaustive list of reasons for properly dismissing an employee. *Baez Garcia v. Cooper Laboratories, Inc.,* 120 D.P.R. 145, 152 n. 5 (1987). The statute's warning that "[d]ischarges by mere whim or fancy of the employer or without any reason related to the proper and normal operation of the establishment shall not be deemed as a discharge for just cause, anticipates additional situations whereby the employee's dismissal is justifiable because it is related to the proper and normal operation" of the business. P.R. Laws Ann. tit. 29, § 185b (Supp.1991). *See, e.g., Delgado Zavas v. Hospital Interamericano de Medicina Avanzada,* 94 J.T.S. 149 at 495, 500, & 503 (1994) (finding that dismissal of employee who created an abusive and sexually hostile work environment constituted "just cause" because it dangerously interfered with the

**51.** Although the statute normally requires that the employee "repeatedly" violate the employer's rules, there are rare cases when "the Act contemplates a single violation or first offense as just cause if it is so serious or potentially damaging as to endanger the order, the safety, or the effi-

ciency which constitute the proper and normal operation of the establishment." *Quiros v. I.T.T. Western Hemisphere Directories, Inc.,* 108 D.P.R. 536, 8 Official English Translations 564, 569 (1979).

normal operations of the hospital and fulfilled public policy against sexual harassment).

The employee's initial responsibility is not an onerous task but it cannot be ignored as if the burden was a phantom. Some employees ignore this burden because it is so seemingly light. However, it is not uncommon for courts to find that the employee has failed to present sufficient evidence to meet the initial burden. *See Arthur Young & Company,* 94 J.T.S. at 11972–73 (1994) (finding that employee's conclusory allegations failed to demonstrate that he was constructively discharged); *Vega v. Kodak Caribbean Ltd.,* 807 F.Supp. 872, 875 (D.P.R.1992) (employee's acceptance of early retirement package was not a dismissal "without just cause" and, therefore, district court granted company's motion for summary judgment under Law 100 and Law 80), *aff'd on other grounds,* 3 F.3d 476 (1st Cir.1993); *De La Garza Blizzard v. Sociedad Española,* 787 F.Supp. 31, 33–34 (D.P.R.1992) (dismissal of former director's secretary because the hospital section was closed constituted "just cause"), *aff'd,* 976 F.2d 724 (1st Cir.1992); *De Arteaga,* 862 F.2d at 942 (dismissal because employee lacked the necessary technical skills, committed various errors, and did not gain the confidence of the sales staff constituted "just cause"); *Menzel v. Western Auto Supply Co.,* 662 F.Supp. 731, 744 (D.P.R.1987) (dismissal because employee failed to follow instructions and negligently handled his work assignments constituted "just cause"), *aff'd,* 848 F.2d 327, 331 (1st Cir.1988); *Narvdez v. Chase Manhattan Bank N.A.,* 120 D.P.R. 731, 739 (1988) (dismissal because employee was inefficient, did not follow business regulations, and failed to show leadership constituted "just cause"); *Baez Garcia,* 120 D.P.R. at 155 (dismissal for incompetence constituted "just cause").

In the case at bar, all the Plaintiffs except Correa have rested solely upon speculative statements and conclusory assertions to meet their initial burden. First, the evidence in the Record establishes clearly that no reasonable employee of Eli Lilly, with the exception of Correa, would have felt compelled to take the early retirement package. As the Court found earlier, the package was a voluntary offer filled with incentives and benefits to attract approximately 4,000 workers who worked for Eli Lilly around the world. Plaintiffs presented no probative evidence that the anticipated salary changes, working conditions, potential demotions, and loss of prestige had the cumulative effect of forcing them into early retirement. Many employees who were similarly situated chose to continue working for the company and did not find that the ERP was the only reasonable alternative left. Eli Lilly's announcement that Plaintiffs and all their co-workers would have to return to the system of working in shifts is analogous to the company's reorganization in *Velez* where the Supreme Court of Puerto Rico expressly found that there was no constructive discharge. Eli Lilly's plan was *not* similar to the take-it-or-leave-it demand in *Hebert v. Mohawk Rubber Co.,* 872 F.2d 1104, 1113 (1st Cir.1989) or *Odriozola v. Superior Cosmetic Distributors Corp.,* 116 D.P.R. 485, 16 Official English Translations 595, 603 (1985).

■ Furthermore, even assuming that Plaintiffs like Correa produced sufficient evidence that there was a constructive discharge, Plaintiffs have not proven the second element of their initial burden: that they were constructively discharged without "just cause." One of the listed reasons for legally discharging employees is the reorganization of a business. Eli Lilly, unlike Plaintiffs, produced credible evidence that it intended to reorganize its operations on a world-wide basis. Only as a result of this reorganization in the interest of staying competitive in the marketplace did the company intend to alter all the employees' working conditions. Having failed to produce any probative evidence to the contrary, Plaintiffs failed to show that they were not constructively discharged without just cause.

■ Going one unnecessary step further, even if Plaintiffs produced the evidence necessary to prove that Eli Lilly constructively discharged them without "just cause," Eli Lilly has met its ultimate burden of demonstrating that Plaintiffs' discharge was not motivated by age discrimination.

Under Law 100, once the employee presents sufficient evidence that the employer discharged him or her without just cause, there is a rebuttable presumption that the discharge was due to discrimination. The burden of proof shifts to the employer who must show by a preponderance of the evidence that discrimination was not a motivating factor in the discharge of the employee. The burden is one of both production and persuasion. *Ibañez*, 14 Official English Translations at 70; *See also Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 723 (1st Cir. 1994) (explaining burden shifting standard under Law 100 in the context of an age discrimination case); *De Arteaga*, 862 F.2d at 943 (1st Cir.1988) (same); *Menzel*, 848 F.2d at 330–31 (same). As the *Ibañez* Court pointed out, Law 100 is much more plaintiff-friendly than its federal counterpart. "Therefore, it is possibly conceivable that in some controversies the result may ultimately rest on which of the two statutes applies." *Ibañez*, 14 Official English Translations at 73.

This is not one of those conceivable situations. Plaintiffs' case is analogous to the findings in *Ibañez, De Arteaga,* and *Vega.* The factors in *Ibañez* that lead the Puerto Rico Supreme Court to find that there was no age discrimination, such as the presence of similarly situated older employees who continued to work for the company, the evidence which supported the employer's non-discriminatory explanation, and the employee's reliance upon speculative arguments, are all present in this case. 14 Official English Translations at 76–77. As in *De Arteaga*, with the exception of the isolated, discriminatory remark by Felipe Belgodere which the Court shall discuss shortly, there is no evidence that age was a motivating factor in Eli Lilly's decision to implement an early retirement plan. Just like the employee in *De Arteaga*, Plaintiffs rely completely upon speculation and improbable inferences to connect age discrimination with Eli Lilly's actions. 862 F.2d at 943. Based on very similar facts whereby a company offered voluntary early retirement, the district court in *Vega* granted summary judgment in favor of the company on the employee's Law 100 claim. 807 F.Supp. at 875.

As with Plaintiffs' ADEA claim, the only scintilla of evidence of age discrimination is the isolated remark of Felipe Belgodere, the plant manager. The Puerto Rico Supreme Court's decision in *Odriozola* is particularly instructive in considering the significance of this remark in the over-all context of an age discrimination claim under Law 100. In *Odriozola*, the Court affirmed a lower court's finding of age discrimination that, at first blush, appears to support Plaintiffs' case. The plaintiff was a sixty-year old leading sales manager who rejected an early retirement offer and was subsequently discharged for allegedly failing to sell a sufficient number of beauty products in Puerto Rico and the Virgin Islands. 16 Official English Translations at 603. One of the sales manager's supervisors called him "old bull." *Id.* at 602. The Court, however, did not rely on this discriminatory remark to find for the employee. Indeed, in the discussion of the merits of the case, the Court fails to mention the comment at all. *Id.* at 615–17. The Court instead focussed on the patently false business explanation asserted in defense of the dismissal by the company. There was overwhelming evidence in the Record that, contrary to the company's allegation, the manager was responsible for a rise in both sales and profits. Because the company could not prove by a preponderance of the evidence that its discharge of the sales manager was due to his poor work, the sales manager won the case. It was the take-it-or-leave-it retirement offer and the false rationale for the discharge, not the "old bull" comment, that ensured the sales manager's victory.

In the case at bar, the circumstances surrounding the isolated, discriminatory remark are starkly different. There was no take-it-or-leave-it retirement demand. There was no actual or constructive discharge. And there was no false rationale proffered to cover up the unlawful discharge. Rather, Plaintiffs accepted a voluntary retirement offer free of undue influence and fraud. The isolated comment by Felipe Belgodere was not targeted at any particular Plaintiff and was diluted by the company's insistence that (a) management-level employees avoid influencing the decisions of the

employees, (b) employees consult a financial, legal, or familiar adviser, and (c) employees would not be dismissed for refusing to accept retirement. In this context, the discriminatory remark is insufficient to link the ERP with an age discrimination motive. Assuming that Defendants constructively discharged Plaintiffs without just cause, therefore, Defendants have met their burden of proving with overwhelming evidence that age was not a motivating factor the implementation of the ERP.

Plaintiffs having failed to demonstrate that they were either (1) constructively discharged (with the exception of Correa) or (2) discharged without "just cause," and Eli Lilly having proven by a preponderance of the evidence that age was not a motivating factor in the company's assumed constructive discharge of Plaintiffs, the Court hereby **grants** Defendants' motion for summary judgment on Plaintiffs' Law 100 claim and dismisses the Law 100 claim with prejudice.

■ Plaintiffs' Article 1802 claim is derivative of their Law 100 claim. Having dismissed the Law 100 claim, therefore, the Court hereby dismisses Plaintiffs' Article 1802 claim with prejudice. *See Santini Rivera v. Serv Air, Inc.,* 94 J.T.S. 121 at 179, 185 (1994) (holding that the employee's parents and girlfriend have a derivative cause of action under Article 1802 for the employer's violation of Law 100); *Maldonado Rodriguez v. Banco Central Corp.,* 95 J.T.S. 48 at 802, 804 (1995) (same); *Martinez Campos v. Banco de Ponce,* 95 J.T.S. 53 at 843 (1995) (same); *Fernandez Grullon v. Puerto Rico Telephone Co.,* 95 J.T.S. 80 at 975 (1995) (same).

### CONCLUSION

For a litany of reasons, the Court hereby grants Defendants' motion for summary judgment on Plaintiffs' ADEA, Law 100, and Article 1802 claims: (1) Plaintiffs violated the anti-ferret rule and conceded that Defendants' list of uncontested facts are true; (2) Plaintiffs failed to establish with probative evidence that the ERP was a take-it-or-leave-it demand and, therefore, failed to establish a prima facie case of constructive discharge; (3) Plaintiffs failed to present evidence that

Defendants sought to replace them or did not treat age neutrally in shrinking its work force; and (4) Plaintiffs did not produce non-conclusory evidence that age was a motivating factor behind the ERP. Plaintiffs' ADEA, Law 100, and Article 1802 claims are hereby dismissed with prejudice. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**